**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Chicago and North Western Transportation Co., Itel Corp., FRVR Corp., Intervenors.**

**Nos. 88–1793, 89–1183.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 1990.
Decided Sept. 14, 1990.

Richard S. Edelman, with whom William G. Mahoney and John O'B. Clarke, Jr. were on the brief, for petitioner in both cases.

Clyde J. Hart, Jr., Atty., Interstate Commerce Commission ("ICC"), with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel, ICC, James F. Rill, Asst. Atty. Gen., John J. Powers III, and Robert J. Wiggers, Attys., Dept. of Justice, were on the brief, for respondents in both cases. John J. McCarthy, Atty., ICC, also entered an appearance for respondents.

Fritz R. Kahn, with whom Russell E. Pommer, Stuart F. Gassner, Myles L. Tobin, and Ralph J. Moore, Jr. (for Chicago and North Western Transp. Co.), and John M. Nannes, Carl V. Lyon, and Stephen M. Olson (for Itel Corp. and Itel Rail Corp.) were on intervenors' joint brief, argued on behalf of intervenors in No. 88–1793.

John M. Nannes, with whom Carl V. Lyon and Stephen M. Olson (for FRVR Corp.) and Fritz R. Kahn, Russell E. Pom-

mer, Stuart F. Gassner, Myles L. Tobin, and Ralph J. Moore, Jr. (for Chicago and North Western Transp. Co.) were on intervenors' joint brief, argued on behalf of intervenors in No. 89–1183.

L. John Osborn also entered an appearance for intervenor Chicago and North Western Transp. Co.

Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

In these related cases, the Railway Labor Executives' Association and the United Transportation Union (collectively, "RLEA") seek review of two decisions of the Interstate Commerce Commission concerning, first, the FRVR Corporation's acquisition of certain rail lines from the Chicago and North Western Transportation Company ("CNW") and, second, the continued control of FRVR by Itel Rail Corporation and its parent, Itel Corporation. The effect of these decisions was to deny the imposition of labor protection conditions for the benefit of CNW's employees. The RLEA contends that the transactions were structured deliberately to evade employee protection, and that the ICC should have looked to the "true nature" of the transactions and disregarded certain "formalities of corporate structure." We conclude that the ICC's interpretation of the relevant statutes was permissible and that their application to the facts of these cases is consistent with the agency's own prior decisions and supported by circuit precedent.

## I. BACKGROUND

### A. Statutory Background

Section 10901 of the Interstate Commerce Act has been held to require the ICC's approval of the acquisition or operation of a rail line by an entity that is not a rail carrier. *See* 49 U.S.C. § 10901 (1982); *Black v. ICC*, 762 F.2d 106, 111, 115 (D.C. Cir.1985); *In re Chicago, M., St. P. & Pac. R.R.*, 658 F.2d 1149, 1169–70 (7th Cir.1981),

*cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Under section 10901, the Commission must find "that the present or future public convenience and necessity require or permit" the acquisition and operation of the line. 49 U.S.C. § 10901(a). Section 10901(e) gives the Commission the discretion to impose certain protective conditions for affected employees. *Id.* § 10901(e). The Commission has generally refrained from imposing labor protection in section 10901 cases unless exceptional circumstances are shown, and we have upheld the Commission's exercise of that discretion. *See, e.g., Black,* 762 F.2d at 116–17.

A different section of the Act, section 11343, governs certain transactions involving two or more rail carriers. 49 U.S.C. § 11343 (1982). As relevant here, section 11343 requires the ICC's prior approval and authorization for the "acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers." 49 U.S.C. § 11343(a)(5).

Any transaction governed by section 11343 is also subject to the labor protection requirements of section 11347, which provides in relevant part as follows:

> When a rail carrier is involved in a transaction for which approval is sought [pursuant to § 11343], the Interstate Commerce Commission *shall* require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as [terms previously imposed by statute]. Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees....

49 U.S.C. § 11347 (emphasis added). Thus, for transactions under section 11343, employee protection is mandatory, while under section 10901, it is discretionary. The statutory minimum employee protective arrangements mandated by section 11347 are extensive and include preservation of collective bargaining rights, reemployment rights, severance pay, continuation of fringe benefits, and the like. *See, e.g.,*

*New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979).

The final provision relevant here is section 10505, under which the ICC is obliged to exempt from prior approval requirements "a person, class of persons, or a transaction or service" if certain findings are made, primarily that regulation "is not necessary to carry out the transportation policy of" the Interstate Commerce Act. 49 U.S.C. § 10505(a) (1982). Such an exemption, however, may not operate to "relieve a carrier of its obligation to protect the interests of employees as required by" the Interstate Commerce Act. *Id.* § 10505(g).

### B. Factual and Procedural Background

Itel Rail Corporation, a subsidiary of Itel Corporation, directly and indirectly controls several rail carriers. The FRVR Corporation, a wholly owned subsidiary of Itel Rail, was formed in 1987 as the vehicle for the rail lines described below. Prior to that acquisition, FRVR had not engaged in any rail operations and was not subject to ICC regulation.

In 1987, FRVR entered into an agreement to purchase the Duck Creek South lines, consisting of about 200 miles of line and incidental trackage rights located between Green Bay and Milwaukee, Wisconsin, from the Chicago and North Western Transportation Company. These are essentially feeder lines for CNW as well as several other railroads; they compete with both motor carriers and a rail carrier. The purchase price was approximately $61 million, of which $14 million was provided by an equity contribution from Itel or Itel Rail, and $47 million by a loan secured by the acquired assets and guaranteed by Itel Rail.

Among Itel Rail's other subsidiaries is the Green Bay & Western Railroad Company ("GB & W"), which operates some 250 miles of track running across the state of Wisconsin between East Winona and Green Bay. As a result of FRVR's purchase of the Duck Creek South lines, FRVR and GB & W will connect at Green Bay, and this

connection will permit GB & W to interchange traffic with CNW at Milwaukee.

Although it is a subsidiary of Itel Rail, FRVR has its own employees, management, and equipment, and it publishes its own tariffs and operates under its own name. One of FRVR's officers and directors is an officer of Itel Rail, and another, an employee. The remaining officers and directors were formerly associated with GB & W. None of the FRVR officers or directors is an officer or director of Itel.

As a non-carrier acquiring a rail line, FRVR was required pursuant to section 10901 to obtain ICC approval of the Duck Creek South purchase, unless it could secure an exemption from the requirement under section 10505. On December 23, 1987, FRVR and CNW applied for the exemption, which automatically became effective under certain class-wide procedures established by the Commission.

In subsequent proceedings, the RLEA challenged FRVR's exemption from prior ICC approval under section 10901, arguing that section 10901 was not applicable to the Duck Creek transaction. The RLEA asserted that FRVR should not have been considered a non-carrier because it was formed for the primary purpose of avoiding the imposition of employee protection under sections 11343 and 11347 and because it was not sufficiently independent of Itel Rail and its subsidiaries, particularly GB & W. The RLEA thus urged that the Commission disregard the "formalities of corporate structure," revoke the exemption, and proceed instead under section 11343, which would trigger the mandatory employee protection under section 11347.

On February 21, 1989, the Commission denied the RLEA's petition for revocation of FRVR's exemption. *FRVR Corporation—Acquisition and Operation Exemption—Chicago and North Western Transportation Company*, Finance Docket No. 31205 (I.C.C. Feb. 21, 1989) ("Acquisition Decision"). At the outset, the Commission declined to impose labor protection under the discretionary "exceptional circumstances" standard of section 10901, a decision the RLEA does not contest. Acquisi-

tion Decision at 6. Turning to the RLEA's arguments, the Commission found that FRVR operated independently of its parent and affiliated carriers and that it had not been created for the sole purpose of evading section 11347's labor protection provisions; therefore, its application was properly considered under section 10901. *Id.* at 6–8. Petitioners seek review of the Acquisition Decision in No. 89–1183.

In the meantime, because FRVR would become a carrier subject to ICC regulation upon consummation of its purchase of the Duck Creek South lines, it became necessary for Itel and Itel Rail to assure themselves of the continued right to control FRVR. Accordingly, on December 24, 1987, they filed a petition pursuant to section 10505 for an exemption from the prior approval and other provisions of section 11343 and for authority to combine control over FRVR with Itel Rail's control over its existing carrier subsidiaries. The Commission granted the exemption and imposed labor protective conditions as required by section 11347, but failed to specify explicitly whose employees would be protected by them.

Following that decision, the RLEA filed a petition for reopening for clarification or reconsideration, urging that the protective conditions be applied to the CNW employees on the Duck Creek South lines. The RLEA argued that Itel Rail's continued control of FRVR was inextricably linked to FRVR's acquisition of CNW's line, as there would be no need for the control authorization without the acquisition, and thus that labor protection must apply to the Duck Creek South employees because they are "employees who are affected by the transaction" at issue in the common control arrangement. Itel, FRVR, and CNW opposed the petition.

In a decision issued on September 12, 1988, the ICC declared that it would not impose labor protection for the benefit of CNW's employees. *Itel Rail Corporation and Itel Corporation—Continuance in Control Exemption—FRVR Corporation*, Finance Docket No. 31206 (I.C.C. Sept. 6, 1988) ("Control Decision"). The Commis-

sion explained that CNW was not a party to the control transaction that was the subject of the exemption, that CNW's employees were not directly affected by it, and that the only employees entitled to labor protection under section 11347 were those of the Itel system. Control Decision at 3. The Commission thus "rejected the argument that employee protection should be extended to employees of nonapplicant carriers." *Id.* In effect, then, the Commission viewed the acquisition of Duck Creek South and the continued control of FRVR as two entirely separate transactions governed by different statutory provisions; the ICC reasoned that only the acquisition transaction "even possibly could have a direct and allegedly adverse effect on CNW employees." *Id.* The RLEA petitions for review of the Control Decision in No. 88–1793.

We address the two petitions together to consider the RLEA's contention that the Control and Acquisition Decisions present interrelated transactions and legal issues. As we find, however, that the ICC properly viewed the transactions as separate, we discuss the two decisions in turn.

## II. DISCUSSION

■ This case turns on the permissibility of the ICC's statutory interpretations. Where, as here, the statute is silent or ambiguous with respect to a specific issue, a reviewing court must defer to the agency's interpretation so long as it is reasonable, even if the court might have taken a different view. *Continental Air Lines v. Department of Transp.,* 843 F.2d 1444, 1449 (D.C.Cir.1988); *see Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 843 & n. 11, 104 S.Ct. 2778, 2781–82, & n. 11, 81 L.Ed.2d 694 (1984). The Commission's decisions themselves, applying the law to the facts of a particular case, will be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2) (1988); *see also Central States Enters. v. ICC,* 780 F.2d 664, 673–74 (7th Cir.1985).

## A. Control Decision

■ In challenging the Control Decision, petitioners argue that within the meaning of section 11347, CNW was "involved" in Itel's continued control of FRVR and CNW's employees were "affected by" the control transaction such that they were entitled to labor protection. In petitioners' view, the control and acquisition proceedings were two necessary and mutually dependent steps in a single transaction; for example, FRVR's acquisition of CNW's line was dependent upon Itel Rail's continued control of FRVR because Itel Rail's equity contribution and loan guarantee had financed the purchase. The underlying allegation, of course, is that Itel created FRVR so that Duck Creek South could be acquired by a noncarrier, thus qualifying the acquisition for section 10901 treatment, preventing CNW from being a party to the control proceeding, and thereby avoiding mandatory labor protection under section 11343. Therefore, petitioners assert, the Commission should have looked to the true nature and practical effects of the transaction, from which perspective CNW was certainly "involved" in, and its employees "affected by," the control transaction.

Whatever Itel's supposed ulterior motives may have been, the Commission's view that section 11347 does not require labor protection for employees of nonapplicant carriers like CNW is firmly supported by previous decisions in this and other circuits. *See Lamoille Valley R.R. v. ICC,* 711 F.2d 295, 323–24 (D.C.Cir.1983); *Southern Pacific Transp. Co. v. ICC,* 736 F.2d 708, 725 (D.C.Cir.1984) (adopting holding and reasoning of *Lamoille Valley* ), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 322 (1985); *see also Missouri–Kansas–Texas R.R. v. United States,* 632 F.2d 392, 410–12 (5th Cir.1980), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981); *Crounse Corp. v. ICC,* 781 F.2d 1176, 1192–93 (6th Cir.), *cert. denied,* 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986).

In *Lamoille Valley,* we reviewed the Commission's approval of a merger of the Maine Central Railroad with the Boston &

Maine Railroad pursuant to section 11343. The Commission imposed labor protection for employees of the merging carriers but not for those of competing railroads who might lose their jobs as a result of the merger. We affirmed the ICC's interpretation of section 11347 "as requiring it to protect only employees of the merging railroads and not employees of other railroads." 711 F.2d at 323.

Petitioners nonetheless argue that *Lamoille Valley* and the other cases we have cited are distinguishable in that they relate only to whether labor protection in the case of a merger should be extended to employees of competitors, and not to the particular facts before us. Those cases cannot be so narrowly limited. Although it is true that protection was sought for employees of competitors, the decisions are not predicated on that fact. In *Lamoille Valley*, for example, we looked first to the language of the statute and reasoned as follows:

> The second sentence of § 11,347 provides that "the arrangement may be made by *the rail carrier* and the authorized representative of *its* employees." (Emphasis added.) The phrase "the rail carrier" presumably refers back to the preceding sentence and thus includes only "a rail carrier ... involved in the transaction." But an arrangement between "a rail carrier involved in the transaction" and "its employees" will not protect employees of other carriers. Thus, Congress must not have contemplated protecting employees of nonapplicant railroads.

*Id.* In addition, we explained that the Commission's interpretation was supported by the legislative history, by "considerations of practicality and administrative economy," by the consistency of the Commission's view of section 11347 since its original enactment in 1940, and by the precedent of other courts. *Id.* at 323–24. None of this reasoning distinguishes employees of competitors from those of non-applicants generally; all of it supports the Commission's contention that CNW's employees are not entitled to the protections of section 11347 for the compelling reason that CNW was not a party to the control proceeding.

Finally, even if the prior cases did not definitively address whether under section 11347 a non-applicant carrier could ever be sufficiently "involved" in a transaction for which approval is sought to trigger labor protection for "affected" employees, we conclude that the ICC's interpretation of "involved" to mean only those who formally participate as parties to a transaction is reasonable. *See Chevron*, 467 U.S. at 843 & n. 11, 104 S.Ct. at 2781–82 & n. 11. We do not decide whether a control transaction might be structured in such a way as to include as parties to "the transaction" entities that are neither the controlled nor the controlling party, and would thus not be applicants before the Commission. Petitioners have not challenged the Commission's finding that CNW was not "a party to the control transaction" and consequently the issue is not before us. Accordingly, we affirm the Control Decision.

B. Acquisition Decision

■ The RLEA also seeks review of the Acquisition Decision, in which the Commission concluded that FRVR's purchase of Duck Creek South was an acquisition by a non-carrier, thus subject to section 10901. The RLEA argues, again, that the formalities of corporate structure—here, the use of a newly created subsidiary to make the purchase—should not be allowed to obscure the true nature and practical effects of the transactions. According to the RLEA, the acquisition of Duck Creek South should have been treated as a section 11343 transaction because of the relationship among the various Itel entities and because FRVR was created largely for the purpose of evading the labor protection provisions of section 11347.

In addressing petitioners' charge that FRVR was effectively the "alter ego" of Itel, the Commission asserted that to sustain their argument, they must

> show[ ] [either] that FRVR was created exclusively for the purpose of evading the labor protection requirements of section 11347 or that FRVR is not a separate entity because it is not sufficiently

independent of its parent or affiliated carriers.

Acquisition Decision at 6. The Commission found that petitioners had failed the first test because the record confirmed that FRVR had been formed for legitimate and substantial business reasons that were unrelated to the labor issue. It also found that there were sufficient indicia of the subsidiary's financial and operational independence to justify classifying it as a non-carrier, citing *Railway Labor Executives' Ass'n v. ICC*, 819 F.2d 1172 (D.C.Cir.1987) ("*RLEA v. ICC*"), and *Railway Labor Executives' Ass'n v. United States*, 791 F.2d 994 (2d Cir.1986) ("*RLEA v. U.S.*"), as authority for this conclusion.

These cases amply support the Commission's analysis of the independence factor. In *RLEA v. ICC*, we reviewed a Commission grant of an exemption from prior approval for a non-carrier's acquisition of a rail line. The acquirer, the Rochester and Southern Railroad, was a wholly owned subsidiary of Genesee and Wyoming Industries, Inc., which also owned two rail carriers that would have benefited from the acquisition. As in this case, the corporations had some common officers and directors, and the acquisition by Rochester and Southern was financed in part by an equity contribution from its parent. Nevertheless, Rochester and Southern would own and operate the line itself, publish its own tariffs, directly serve the acquired line's patrons, assume responsibility for its own financial and contractual obligations, purchase its own equipment, and hire its own employees. *See* 819 F.2d at 1172–73; *Rochester and Southern R.R. and Genesee and Wyoming Industries, Inc.—Exemption from 49 U.S.C. 10901, 11301, and 11343*, Finance Docket No. 30779 (I.C.C. June 27, 1986), at 2, 5. In affirming the Commission's determination that Rochester and Southern was an independent corporate entity, we explained:

> Where, as here, a subsidiary is financially independent of its parent corporation *and* is not financially guaranteed by the parent ... the ICC is not *compelled* to ignore corporate formalities, but may instead decide each case on its own facts,

treating related entities as separate where, in its judgment, the facts demonstrate sufficient indicia of independence.

819 F.2d at 1173 (emphasis in original). We then concluded that the ICC's analysis of Rochester and Southern's independence was reasonable and supported by the facts. *Id.*

The Second Circuit reached the same conclusion on similar facts in *RLEA v. U.S.*, 791 F.2d at 1006, which we cited with approval in our *RLEA v. ICC* decision. *See RLEA v. ICC*, 819 F.2d at 1173. There, the parent company guaranteed its subsidiary's financial obligations to the selling carrier in connection with the purchase of approximately thirty-one miles of track and trackage rights. The guarantee did not, however, extend to any obligations that the subsidiary might incur in the operation of the newly acquired line. Looking to the "indicia of independence" of the subsidiary, the court affirmed the Commission's conclusion that the subsidiary was independent and thus a non-carrier, explaining that with the exception of the initial purchase guarantee, the subsidiary "ha[d] assumed all of the risks of the venture on its own and is not to be financially guaranteed by its parent." 791 F.2d at 1006.

In the instant case, the Commission followed precisely the reasoning of *RLEA v. ICC* and *RLEA v. U.S.*, and treated Itel and FRVR as separate entities based on its assessment of FRVR's independence. *See* Acquisition Decision at 7–8. In its factual analysis, moreover, the Commission adhered to clear precedent: Like Rochester and Southern in *RLEA v. ICC*, FRVR would own and operate the acquired line under its own name, publish its own tariffs, have its own employees, management, and equipment, and assume sole responsibility for its own operating liabilities. *Id.* at 4, 7–8. Thus, on examining the indicia of FRVR's independence, the Commission reasonably concluded that FRVR was financially and operationally independent of its parent and a non-carrier. *See* Acquisition Decision at 8.

Petitioners, however, argue that Itel's guarantee of a portion of the acquisition

debt—a condition admittedly not present in *RLEA v. ICC*—demonstrates that FRVR is not sufficiently independent of its parent. We agree with the ICC that this guarantee alone need not negate FRVR's financial independence. Although, in *RLEA v. ICC*, we did not specifically adopt the distinction made in *RLEA v. U.S.* between a financial guarantee undertaken by the parent in connection with the initial acquisition financing of its subsidiary and a financial guarantee of the subsidiary's operations, *see* 791 F.2d at 1006, that distinction is reasonable and properly applied in this case. A newly organized subsidiary will be endowed either with assets with which to commence business or with the financial means to acquire them. It makes little difference whether the initial financing takes the form of cash or a debt guarantee to cover the purchase of capital assets. We thus find it perfectly reasonable for the Commission to conclude that FRVR is financially independent of its parent because "Itel [has] assum[ed] none of the risks in the operation of the line." Acquisition Decision at 8.

Petitioners nevertheless challenge the Commission's test of independence by referring us to several recent ICC decisions which, they say, undermine the Commission's reasoning in the instant case by using a different standard for determining whether a subsidiary is a non-carrier. *See, e.g., Delaware and Hudson Ry. Co.— Lease and Trackage Rights Exemption— Springfield Terminal Ry. Co.*, Finance Docket No. 30965 (I.C.C. Oct. 23, 1989); *Rio Grande Indus., Inc.—Purchase and Related Trackage Rights—Soo Line R.R. Line Between Kansas City, MO and Chicago, IL*, Finance Docket No. 31505 (I.C.C. Nov. 13, 1989). Whatever the merits of those decisions, they have no bearing on our disposition of the petition for review of the Acquisition Decision because that decision was delivered before the ones cited by petitioners. It is our task to determine whether that case was properly decided on the basis of the policies and precedents relied on by the agency at the time of its decision. *See, e.g., Reservation Tele. Coop. v. FCC*, 826 F.2d 1129, 1134 (D.C.Cir.

1987); *Population Institute v. McPherson*, 797 F.2d 1062, 1092 (D.C.Cir.1986).

The other factor relied on by the ICC in determining FRVR's status was whether "FRVR was created *exclusively* for the purpose of evading the labor protection requirements of section 11347." Acquisition Decision at 6 (emphasis added). Petitioners urge that the formalities of corporate structure should have been disregarded because a substantial purpose of FRVR's creation was to evade the imposition of labor protection.

As evidence of such a purpose, petitioners point to certain provisions of the purchase agreement between FRVR and CNW that stipulate, first, that consummation of the transaction is conditioned on its exemption from ICC regulation under section 10901; second, that FRVR warrants that it will qualify as a non-carrier within the meaning of section 10901, "it being understood that one of the factors inducing [CNW] to enter into this Agreement is the foregoing representation"; and third, that the closing of the transaction is subject to the condition that "no administrative or judicial order or decision shall contain or impose on [FRVR] any conditions or provisions for labor ... protection...." Petitioners maintain that these provisions indicate that the transaction was deliberately structured to avoid employee protection.

In its decision, the ICC responded to this argument by observing, first, that "the existence of the Agreement's labor provisions is not, by itself, dispositive of the issue of whether FRVR was created exclusively to evade labor protection." Acquisition Decision at 6. It then referred to a similar purchase agreement in another case in which the Commission had concluded that such provisions served the legitimate business purposes of "preserv[ing] contractual freedom should the economics of an agreement be altered by regulatory action" and "establish[ing] the compensation the seller is willing to receive and the amount the buyer is willing to pay." *Id.* at 7. The Commission found that in the instant case the labor provisions served legitimate objectives and that the RLEA had "submitted

nothing of record" to show that the avoidance of labor liabilities was "the exclusive reason for the creation of FRVR." *Id.*

At the same time, the Commission declared that "the evidence suggests that FRVR was created for a number of reasons." *Id.* For instance, the Commission noted that Itel Rail and CNW believed that as a local short-line carrier, FRVR would be able to forestall the traffic erosion that CNW had been experiencing on the Duck Creek South lines and otherwise to compete successfully with motor and other carriers in the area. This conformed with the Commission's own experience, which indicated that small regional carriers were able to operate marginal lines more effectively than larger carriers because of their local orientation and dependence on local traffic for survival. *Id.* The ICC also observed that FRVR's creation resulted from the desire to insulate Itel and Itel Rail from the risks assumed by their subsidiary's new venture beyond the amount advanced as initial capital in the form of cash and a loan guarantee. *Id.*

There is evidence in the record to support the ICC's conclusion that these were in fact valid reasons for FRVR's creation. In the notice filed by FRVR and CNW for an exemption from section 10901, the two companies represented that

> FRVR was formed as a separate subsidiary ... because this structure ... will minimize the risks to Itel Rail of this new regional rail operation. In addition, this structure will make it possible to consummate the transaction and commence operations more quickly than any other available alternative. Itel Rail and FRVR have determined that timely commencement of service is absolutely essential to FRVR's ability to compete with other rail and motor carriers in the area. In particular, FRVR will face substantial competition from Wisconsin Central Ltd., which has been actively soliciting commitments from shippers. This structure offers FRVR the greatest prospect of being able to commence operations quickly, a vital element of its strategy to be an able and effective competitor in the region.

Notice of Exemption filed Sept. 28, 1988, at 4–5. These assertions are supported by a verified statement of Stephen P. Selby, President of FRVR, who confirmed the above and stated that "[w]e recognize that the major factor which makes regional railroad operations a success is their ability to be customer responsive quickly and at top levels." Verified Statement of Stephen P. Selby dated Dec. 22, 1987, at 2, 8. *See also* Verified Statement of L.F. Fox, Assistant Vice President of CNW, at 5 ("Our objective now is to identify lines which, while characterized by conditions that preclude successful operations by [CNW] ..., nevertheless can be operated profitably and efficiently by a new regional carrier.").

Based on the above, we are satisfied that the Commission reasonably concluded that FRVR was organized for substantial business reasons unrelated to the employee protection liabilities that would have been incurred had the purchase been made by an operating rail subsidiary. We are reluctant, however, to endorse the Commission's formulation that in order to be considered an alter ego of its parent, a subsidiary must have been created for the exclusive purpose of evading the employee protection provisions of section 11343. We prefer to defer that determination until such time as we are presented with a case where the justifications for the formation of a non-carrier subsidiary are less substantial, and the reasonableness of the Commission's rule can be put to a more demanding test.

In the instant case, therefore, we simply conclude that as FRVR met the test of independence and was formed for reasons that are both legitimate and substantial, the ICC could reasonably determine that it was a non-carrier for purposes of section 10901.

## III. CONCLUSION

We conclude that the Commission's interpretations of sections 10901 and 11343 are reasonable and consistent with our precedent, and that its application of the law to the facts of these cases supports its findings that CNW was not involved in the

control transaction and that FRVR is an independent entity formed for legitimate business purposes, and therefore a non-carrier. Accordingly, the Commission properly declined to impose labor protective conditions for the benefit of CNW's employees. The petitions for review are

*Denied.*