**RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Petitioner,**

v.

**INTERSTATE COMMERCE COM-
MISSION and United States of
America, Respondents,**

Norfolk Southern Railway Company,
Chesapeake & Albemarle Railroad
Company, Inc., Intervenors.

**UNITED TRANSPORTATION
UNION, Petitioner,**

v.

**INTERSTATE COMMERCE COM-
MISSION and United States of
America, Respondents,**

Norfolk Southern Railway Company,
Chesapeake & Albemarle Railroad
Company, Inc., Intervenors.

Nos. 91–1524, 91–1549.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 1993.

Decided July 30, 1993.

John O'B. Clarke, Jr., Washington, DC, argued the cause for petitioners. On brief were William G. Mahoney, Washington, DC, and Clinton J. Miller III, Cleveland, OH.

Clyde J. Hart, Jr., Attorney, I.C.C., Washington, DC, argued the cause for the respondents. On brief were Henri R. Rush, Deputy Gen. Counsel, and John J. McCarthy, Jr., Associate Gen. Counsel, I.C.C., and J. Mark Gidley, Acting Asst. Atty. General, John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, DC.

Jeffrey S. Berlin, Washington, DC, argued the cause for the intervenors.

On joint brief were Mark E. Martin, Washington, DC, and William P. Stallsmith, Jr., Norfolk, VA, for Norfolk Southern Ry. Co.

Kelvin J. Dowd and Frank J. Pergolizzi, Washington, DC, for Chesapeake & Albemarle R. Co., Inc.

Before D.H. GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The petitioners, two railway labor organizations, seek review of an Interstate Commerce Commission (ICC or Commission) decision under 49 U.S.C. § 10901 approving the lease of a small railroad line to a non-carrier subsidiary of a rail carrier. The petitioners maintain that the rail carrier formed the subsidiary to evade labor protection mandated by 49 U.S.C. § 11343. Hence, they claim the Commission erred by failing to treat the transaction under section 11343 or by failing to exercise its discretion to impose labor protection under section 10901. Because we conclude that the carrier formed the subsidiary for the legitimate business reason of avoiding unusual administrative delays associated with section 11343 transactions and because we find that the lease involved no exceptional circumstances, we uphold the Commission's action under section 10901.

I.

Under the Interstate Commerce Act (Act), 49 U.S.C. §§ 10101 *et seq.*, any entity that provides railroad transportation for compensation is a rail carrier. 49 U.S.C. § 10102(20). North Carolina and Virginia Railway, Inc. (NCV), a rail carrier, is a subsidiary of RailTex, Inc. (RailTex), a non-carrier holding company. In 1990, Southern Railway Company (Southern),[1] another rail carrier, agreed to lease to NCV its Edenton line, a 73 mile stretch of track running from Chesapeake, Virginia, to Edenton, North Carolina.

The Act contains two distinct regulatory paths, section 11343 and section 10901, by which the ICC oversees an agreement to lease a rail line. *See* 49 U.S.C. §§ 10901, 11343. The ICC applies section 11343 to transactions between two carriers; in contrast, the Commission uses section 10901 for leases by non-carriers. *See Railway Labor Executives' Ass'n v. ICC*, 914 F.2d 276, 277–78 (D.C.Cir.1990). Under section 11343, a "lease ... to operate property of another carrier by any number of carriers" requires prior ICC approval. 49 U.S.C. § 11343. A section 11343 transaction is also subject to mandatory labor protection as prescribed in 49 U.S.C. § 11347.[2]

---

1. Southern is now the Norfolk Southern Railway Company.

2. Section 11347 provides:

When a rail carrier is involved in a transaction for which approval is sought under sections 11344 ... of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protec-

tive of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976. 49 U.S.C. § 11347. Section 11344 requires transactions under section 11343 to follow its provisions. 49 U.S.C. § 11344. In general, section 11344 affords employees substantial protection, including preservation of collective bargaining rights, reemployment rights and severance

On January 22, 1990 NCV and Southern filed an application for approval with the ICC, seeking to exempt under 49 U.S.C. § 10505 the Edenton line lease from several of the requirements for a section 11343 transaction but not from the mandatory section 11347 labor protection.[3] Several weeks later, NCV and Southern withdrew their application, informing the Commission that "a possible restructuring of the transaction ... is under consideration." J.A. at 34. RailTex then formed a new subsidiary, Chesapeake and Albemarle Railroad Company, Inc. (C & A), which it claimed was not a carrier and therefore not subject to section 11343. C & A entered into an identical agreement with Southern to lease and operate the Edenton line.

As noted, section 10901, not section 11343 of the Act, governs a transaction involving a non-carrier. *See* 49 U.S.C. § 10901; *Black v. ICC,* 762 F.2d 106, 111 (D.C.Cir.1985). Under that section, the Commission may approve the transaction only if "the present or future public convenience and necessity require or permit" the acquisition and operation of the line by a non-carrier. 49 U.S.C. § 10901(a). Section 10901(e) gives the Commission the discretion to impose protective labor conditions but the Commission has generally refrained from doing so unless the transaction manifests exceptional circumstances. For a transaction involving a carrier under section 11343, then, employee protection is mandatory while, under a section 10901 transaction involving a non-carrier, labor protection is discretionary.

In late March 1990, C & A filed a petition with the ICC seeking to exempt the new Edenton line lease from section 10901's prior approval requirements. The Commission conditionally granted the exemption and al-lowed C & A to begin operation of the Edenton line. Several weeks later, while final approval of the transaction was still pending, the Railway Labor Executives' Association (RLEA) and the United Transportation Union (UTU) filed a petition seeking partial revocation of C & A's section 10901 exemption.[4] Rail Labor argued that the transaction should have been governed by section 11343 and thus subject to employee labor protection. Alternatively, Rail Labor maintained that RailTex created C & A solely to avoid section 11343's mandatory labor protection. According to Rail Labor, exceptional circumstances therefore existed warranting the ICC's use of its discretionary power to include labor protection in a section 10901 transaction. In response, RailTex contended that it had created C & A to avoid the unusual administrative delay associated with approval of section 11343 transactions and that it had therefore done nothing improper.

The Commission employs an "alter ego" test to determine whether a subsidiary like C & A is a rail carrier whose transactions are subject to section 11343 or a non-carrier whose transactions can be approved under section 10901. Under the alter ego test, a subsidiary that is nominally a non-carrier is treated as an extension of its parent if (1) it is not sufficiently independent of its parent or other affiliated carriers or (2) it is created for the exclusive purpose of evading section 11347 labor protection. *See FRVR Corp.— Acquisition and Operation Exemption,* ICC Finance Docket No. 31205 at 6 (1989) [hereinafter *FRVR II*]. The Commission concluded that C & A could not be considered the alter ego of RailTex and that the Edenton line lease was thus suitable for treatment under section 10901. First, the Commission found that C & A's financing, management

pay. *See New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979) (protection in sales transactions); *Mendocino Coast Ry.—Lease and Operate—California W.R.R.,* 354 I.C.C. 732 (1978) (protection in lease transactions).

**3.** Under 49 U.S.C. § 10505, the ICC "shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision ... is not necessary to carry out ... transportation policy ... or ... the transaction or service is of limited scope." Section 10505 also provides, however, that the Com-mission "may not exercise its authority under this section ... to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle." 49 U.S.C. § 10505(g). Thus, the ICC may not exempt a carrier participating in a section 11343 transaction from the section 11347 labor protection.

**4.** Because Rail Labor and UTU make the same arguments to us on review, we will refer to the two petitioners collectively as "Rail Labor."

and daily operation did not depend on Rail-Tex so that the first prong of the alter ego test had not been satisfied. Second, the ICC determined that RailTex created C & A "to avoid delay, which it viewed as unacceptable from a financial, operational or risk assessment standpoint." *Chesapeake & Albemarle RR Co.—Lease, Acquisition and Operation Exemption*, ICC Finance Docket No. 31617 at 9 (1991) (J.A. at 270). Accordingly, the ICC held that RailTex did not form C & A for the exclusive purpose of avoiding section 11347 labor protection. *Id.* Finally, the ICC declined to use its discretionary power under section 10901 to impose labor protection on the C & A lease transaction.

■ Both the RLEA and UTU filed petitions for review in this court. We consolidated the petitions.[5] The two petitioners (collectively Rail Labor) present this court with four arguments. First, Rail Labor maintains that the ICC erred in finding that C & A had not been formed for the exclusive purpose of evading section 11347's labor protection. Second, Rail Labor contends that the exclusive purpose prong of the alter ego test as construed by the ICC eviscerates section 11343 and therefore conflicts with the Act. Third, Rail Labor asserts that the Edenton line lease manifests "exceptional circumstances" and, accordingly, the Commission should have used its discretionary power under section 10901 to impose labor protection. Fourth, Rail Labor claims that the ICC's test for the imposition of labor protection under section 10901 is so narrow that it reads out the agency's discretion. We find that substantial evidence supports the Commission's conclusion that RailTex formed C & A for a legitimate business purpose unrelated to labor protection—the desire to avoid delay. We also find that the Edenton line lease involved no exceptional circumstances warranting imposition of labor protection. We do not reach the petitioners' challenges to the ICC's alter ego test and to its exercise of discretion under section 10901. Accordingly, we deny the petitions.

## II.

### A. The Exclusive Purpose Prong of the Alter Ego Test

■ If a carrier or a holding company with carrier subsidiaries forms a non-carrier subsidiary for the exclusive purpose of evading labor protection, the Commission treats the subsidiary as a carrier subject to section 11343. *See FRVR II* at 6. Here, however, the record contains substantial evidence to support the ICC's finding that RailTex formed C & A to avoid an unusually lengthy administrative delay and not to evade labor protection. In fact, NCV initially applied under section 11343 and conceded that the Edenton line lease would be subject to labor protection under that section. Labor protection seemed to be of little concern to the parties.[6] NCV withdrew its section 11343 application and RailTex formed C & A only after it became apparent that the administrative processing of the NCV application under section 11343 would be unusually lengthy. J.A. at 100.

Before mid–1989, ICC approval under section 11343 generally took less than three months for unopposed applications.[7] Begin-

---

5. In *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810–11 (D.C.Cir.1993), we questioned RLEA's standing to challenge an ICC decision resolving labor disputes arising from the lease of rail lines between two rail carriers. For prudential reasons, however, we declined to resolve the standing issue. *Id.* In that case, we noted that UTU, a second petitioner, raised the same claims that RLEA raised. If one party has standing, a court need not determine whether aligned parties also have standing if that determination does not affect the merits of the case. *See Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973). Because UTU makes the same arguments before us as does RLEA and UTU clearly has standing, *see Railway Labor Executives' Ass'n*, 987 F.2d at 810–11, pru-

dential concerns likewise weigh against our resolving the issue of RLEA's standing here.

6. Rail Labor conceded at oral argument that the Edenton line lease would affect only a handful of employees.

7. *See, e.g., Indiana Hi–Rail Corp.—Lease Exemption*, ICC Finance Docket No. 31441 (1989) (two month approval); *Laurinberg & S. R.R. Co.—Lease & Operation Exemption*, ICC Finance Docket No. 31526 (1989) (37 day approval). In their joint brief, Southern and C & A point to 11 other leases involving Southern or affiliated carriers which received ICC approval under section 11343 between November 1988 and November

ning in 1990, however, the ICC deferred action on section 11343 petitions while it resolved issues raised in *Wilmington Terminal,* 6 I.C.C.2d 799 (1990), regarding the extent of labor protection to be imposed on section 11343 transactions.[8] Before deciding *Wilmington Terminal,* the ICC delayed at least six section 11343 filings for periods of between 7 and 14 months.[9] The delays occurred in applications involving both sales and leases. For example, in *Canadian National Railway Co.—Lease from Grand Trunk Western Railroad Co.,* ICC Finance Docket No. 31387, the Commission deferred approval of a lease transaction from July 1989 until August 1990. Likewise, in *South Carolina Central Railroad Co., Inc.—Purchase—CSX Transportation, Inc. Line Between East Greenville & Laurens, SC,* ICC Finance Docket No. 31469, another RailTex subsidiary filed a petition for approval of a sale under section 11343 in May 1989. In November 1989, the ICC extended the deadline for its decision by sixty days. Twice more, in January and February 1990, it postponed the deadline for 30 additional days. Finally, in March 1990, it extended the deadline for an additional 120 days. Several continuances occurred *after* NCV filed for approval under section 11343. Thus, the record indicates that a substantial delay existed at the time and that it almost certainly would have affected NCV's application for approval under section 11343.

Moreover, in a verified statement, David Valentine, vice-president of RailTex and president of both C & A and NCV, told the Commission that RailTex "became aware of a number of ICC orders issued in other cases ... wherein the ICC was extending the deadlines for the issuance of final decisions." J.A. at 100. In light of this information,

Valentine stated that RailTex decided to withdraw NCV's application and restructure the transaction. According to Valentine, "it became apparent that if we simply proceeded on the course we had begun, NCV would face delays of up to a year or more before beginning operations over the Edenton Line. This simply was not acceptable from a financial, operational or risk assessment standpoint." J.A. at 101.

According to Rail Labor, however, the desire to avoid delay cannot satisfy the exclusive purpose prong of the alter ego test without eviscerating section 11343. Rail Labor's argument proceeds as follows. All applications for Commission approval experience some delay. If delay alone constituted a legitimate reason for forming a subsidiary, then a carrier who also wished to avoid labor protection could obtain non-carrier treatment under the exclusive purpose test simply by forming a non-carrier subsidiary and claiming that its decision was based on the desire or need to avoid delay. The subsidiary would then always be eligible for section 10901 approval with discretionary labor protection rather than section 11343 approval with mandatory labor protection. Rail Labor claims its argument has special force here because the administrative delay was caused by the ICC's resolution of *labor protection issues* in *Wilmington Terminal.*

As we have recently noted, the existence of both section 11343 and section 10901 "foreclose[s] the Commission from regulating *all* line transfers under section 10901. Otherwise, Congress's decision to enact [section 11343], and to impose special requirements on line transfers falling within that provision, would be inexplicable." *Redden v. ICC,* 956 F.2d 302, 308 (D.C.Cir.1992) (emphasis in original). At the same time, however, we

1989. The approval time for all was less than two and one half months. *See* Intervenor's Br. at 9–11 n. 7, 18 n. 12.

8. In *Wilmington Terminal,* the ICC considered and ultimately rejected the contention that the buyer and the seller were required to sign a single "umbrella" agreement protecting all employees affected by the transfer. Instead, the ICC allowed the seller to extend protection to its employees while the buyer extended labor protection under a separate agreement to its em-

ployees. *Wilmington Terminal R.R.—Purchase & Lease—CSX Transp.,* 6 I.C.C.2d 799 (1990).

9. *See, e.g. Burlington N. R.R. Co.,* ICC Finance Docket No. 31534 (1990); *South Carolina Cen. R.R. Co.,* ICC Finance Docket No. 31469 (1990); *Canadian Nat'l Ry. Co.,* ICC Finance Docket No. 31387 (1990); *Delta S. R.R. Co.,* ICC Finance Docket No. 31584 (1990); *Wilmington Terminal R.R.,* ICC Finance Docket No. 31530 (1990); *Ogeechee Ry.,* ICC Finance Docket No. 31570 (1990).

have indicated that "[t]he Commission is free ... to resolve ambiguity about the respective coverages of the two sections in any reasonable manner." *Id.*

In *Railway Labor Executives Ass'n v. ICC,* 914 F.2d 276, 284 (D.C.Cir.1990), we considered a similar argument made by Rail Labor. There, we noted that we were "reluctant ... to endorse the Commission's formulation that in order to be considered an alter ego of its parent, a subsidiary must have been created for the exclusive purpose of evading the employee protection provisions of section 11343." Because we concluded that "substantial business reasons unrelated to the employee protection liabilities" led to the formation of the subsidiary in that case, however, we sidestepped deciding whether the exclusive purpose test conflicts with section 11343 "until such time as we are presented with a case where the justifications for the formation of a non-carrier subsidiary are less substantial, and the reasonableness of the Commission's rule can be put to a more demanding test." *Id.* We reach the same conclusion here.

Rail Labor's argument might be more persuasive if the delay RailTex sought to avoid were the *normal* processing delay for section 11343 transactions. Here, however, RailTex sought to avoid the unusual and excessively lengthy administrative delay in effect while the ICC evaluated a portion of its labor protection policy. Moreover, we attach little significance to the fact that the ICC's resolution of *labor protection* issues in *Wilmington Terminal* caused the delay. Neither RailTex nor the Edenton line lease was involved in the *Wilmington Terminal* dispute so that labor protection for Edenton line employees specifically had nothing to do with the delay. Accordingly, because a "substantial business reason[ ] unrelated to the employee protection liabilities" for the formation of C & A existed, *Railway Labor Executives Ass'n,* 914 F.2d at 284, we defer scrutiny of the ICC's exclusive purpose test to another day.

## B. *Exceptional Circumstances*

■ Having determined that the ICC properly treated C & A's Edenton line lease application under section 10901, we now determine whether the Commission abused its discretion by failing to impose labor protection on the transaction under section 10901(e).[10] The ICC has indicated that it will impose labor protection under section 10901(e) if the transaction involves one of the following "exceptional circumstances": (1) misuse of Commission rules or precedent, (2) an existing labor contract specifying that all transactions are subject to procedural or substantive labor protection or (3) unique injury to labor disproportionate to gains achieved by the local transport system, but only if the injury can be redressed without terminating the transaction or substantially undoing prospective benefits to the affected parties. *FRVR Corp.—Exemption Acquisition & Operation,* ICC Finance Docket No. 31205 at 3–4 (1988) [hereinafter *FRVR I* ].

Rail Labor argues that the Edenton lease warrants labor protection under both the first and third prongs of the exceptional circumstances test. First, Rail Labor claims RailTex misused the Commission's rules by withdrawing NCV's section 11343 application and forming C & A to apply under section 10901. We find no merit in this contention. As we have already stated, RailTex's reason for the change was legitimate. RailTex did not seek to evade section 11343's labor protection; instead, it attempted to avoid an uncertain and unusually lengthy administrative delay associated with section 11343 transactions. RailTex claimed the delay, which could have lasted more than a year, would have produced financial and operational risks that it found unacceptable. J.A. at 100. Accordingly, RailTex's attempt to restructure the transaction under section 10901 did not misuse the Commission's rules.

Moreover, the record contains no evidence that the Edenton line lease caused labor to suffer a unique injury disproportionate to the benefit achieved by the local transport sys-

---

**10.** Section 10901(e) provides:

· The Commission may require any rail carrier proposing both to construct and operate a new railroad line pursuant to this section to provide

a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby....
49 U.S.C. § 10901(e).

**580**

tem. Before the Commission, Rail Labor contended that Southern abolished one signal maintainer position, one agent/operator position and one "extra board." J.A. at 264. Rail Labor conceded, however, that only seven employees were affected by the actions, none was fired and at least five of the seven did not face any reduction in pay. *Id.* Rail Labor presented no additional evidence "quantifying or even discussing in meaningful detail the effect [of the Edenton line lease] on employees, much less any evidence that the effect was unique or disproportionate." J.A. at 271. Even under a broad reading of the exceptional circumstances test, this change could hardly be viewed as unique or disproportionate injury.

■ Rail Labor next argues that the statutory policy of providing for "just and reasonable treatment [of railroad employees as] an essential aid to the maintenance of a service uninterrupted by labor disputes" mandates the imposition of labor protection here. *United States v. Lowden,* 308 U.S. 225, 235–36, 60 S.Ct. 248, 253–54, 84 L.Ed. 208 (1939). According to Rail Labor, when, as in this case, the parties initially anticipated labor protection and the costs of imposing that protection were not overwhelming, the policy requires labor protection. In other words, because the transaction is *not exceptional* and the burdens imposed on C & A are not overwhelming, the transaction merits labor protection.

Rail Labor's argument turns the exceptional circumstances test on its head. It suggests that the Commission should ordinarily impose labor protection on section 10901 transactions unless doing so would place some special burden on the railroads. The argument ignores the fact that section 10901(e) states that the Commission "*may* require" labor protection, thus expressly vesting the Commission with discretion. 49 U.S.C. § 10901(e) (emphasis added). There is no language in section 10901(e) which would require the ICC to use its discretion in the manner suggested by Rail Labor. The Commission claims it has chosen to promote simplicity, efficiency and lower costs for short line railroads by imposing labor protection on section 10901(e) transactions only in

exceptional circumstances. *See FRVR I* at 1–4. We need not determine whether the exceptional circumstances test properly circumscribes the Commission's discretion in all circumstances. Here, however, as RailTex acknowledges, its section 10901 application without labor protection was more complex and expensive than the original section 11343 transaction because RailTex created a new subsidiary. J.A. at 267. But that does not mean that the Act requires the ICC to make that transaction even *more* complex and expensive by also requiring labor protection under section 10901.

■ Finally, Rail Labor maintains that the ICC's application of the exceptional circumstances test contravenes Congressional intent because the Commission, applying it in contested cases, has never imposed labor protection. We have some sympathy for this argument. As the dissenting commissioner here noted, "[s]ince the establishment of the section 10901 class exemption in 1985, the Commission in over 35 contested exemption cases has yet to exercise its 'discretion' to impose labor conditions." J.A. at 275. If this case fit any of the exceptional circumstances enunciated by the Commission, we might be inclined to examine more closely the scope of the test. But we have found no evidence that the transaction misused Commission rules or resulted in a disproportionate injury to labor. If anything, the Edenton line lease produces almost no injury to labor. As the Commission noted, although a few employees may have been displaced, "railway labor viewed as a whole will also benefit by the additional employment opportunities that may arise if the new carrier is successful." J.A. at 271. In short, because the circumstances here are clearly *unexceptional,* we have no reason to believe that the ICC in this case contravened Congressional intent by failing to impose labor protection.

### III.

In summary, we conclude that substantial evidence supported the ICC's conclusion that RailTex formed C & A to avoid the lengthy delays associated with section 11343 transactions rather than to avoid labor protection. Further, we think the unusual delay consti-

tutes a legitimate business reason unrelated to labor protection and we do not resolve the question whether a non-carrier subsidiary must have been created *exclusively* to avoid labor protection to use section 11343. Finally, we find that the Edenton line lease presented no exceptional circumstances warranting the discretionary imposition of labor protection under section 10901. Because the transaction was so *unexceptional,* we do not address the proper bounds of the ICC's discretion to impose labor protection under its exceptional circumstances test. For the preceding reasons, the petitions are

*Denied.*