15 F.3d 641
 145 L.R.R.M. (BNA) 2437, 127 Lab.Cas. P 10,990
 FOX VALLEY & WESTERN LIMITED, Petitioner,
and
Wisconsin Department of Transportation, Intervening-Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
United Transportation Union, et al., Intervening-Respondents.
 No. 93-1286.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 3, 1993.
Decided Jan. 27, 1994.
 
 Michael D. Dabertin, Robert Wheeler (argued), Thomas J. Litwiler, Oppenheimer, Wolff & Donnelly, Janet H. Gilbert, Chicago, IL, for Fox Valley & Western Ltd.
 Ira H. Raphaelson, Asst. U.S. Atty., Crim. Div., Chicago, IL, Louis Mackall (argued), I.C.C., Office of Gen. Counsel, William P. Barr, Office of U.S. Atty. Gen., John J. Powers, III, Robert J. Wiggers, Dept. of Justice, Antitrust Div., Appellate Section, Washington, DC, William Redmond, I.C.C., Compliance & Consumer Assistance, Chicago, IL, for I.C.C., and U.S.
 Clinton J. Miller, III, Kevin C. Brodar (argued), United Transp. Union, Cleveland, OH, for United Transp. Union.
 Harold A. Ross, Ross & Kraushaar, Cleveland, OH, for Brotherhood of Locomotive Engineers.
 William G. Mahoney, Richard S. Edelman (argued), Donald F. Griffin, Highsaw, Mahoney & Clarke, Washington, DC, for Brotherhood of Maintenance of Way Employees, Brotherhood of R.R. Signalmen, International Broth. of Boilermakers and Blacksmiths, International Broth. of Firemen & Oilers and Sheet Metal Workers Intern. Ass'n.
 Joseph Guerrieri, Jr., Guerrieri, Edmond & James, Washington, DC, for International Ass'n of Machinists & Aerospace Workers.
 Arvid E. Roach, II, Charles A. Miller, Covington & Burling, Washington, DC, Stuart F. Gassner, James P. Daley, Ronald J. Cuchna, Chicago Northwestern Ry. Co., Law Dept., Chicago, IL, for Chicago and North Western Transp. Co.
 James S. Thiel, Allyn Lepeska (argued), Wisconsin Dept. of Transp., Madison, WI, for Wisconsin Dept. of Transp.
 Mitchell M. Kraus, Transportation Communications Union, Rockville, MD, for Transportation Communications Intern. Union (TCU).
 Ralph J. Moore, Jr., Richard T. Conway, Eugenia Langan, Shea & Gardner, David P. Lee, National Ry. Conference, Vice Chairman and Gen. Counsel, Washington, DC, for National Ry. Labor Conference, amicus curiae.
 Laurence R. Latourette, Preston, Thorgrimson, Ellis & Holman, Washington, DC, for Regional R.R. of America, amicus curiae.
 Thomas C. Dorsey, American Short Line R.R. Assoc., Washington, DC, for American Short Line R.R. Ass'n, amicus curiae.
 Before POSNER, Chief Judge, COFFEY, Circuit Judge, and ZAGEL, District Judge.*
 POSNER, Chief Judge.
 
 
 1
 Fox Valley & Western Ltd. asks us to set aside a pair of orders by the Interstate Commerce Commission the effect of which is to impose onerous worker-protection conditions on the transaction by which Fox Valley became a rail carrier. 9 I.C.C.2d 209 (1992), 272 (1993). That transaction (irrelevant details of which we omit) involved Fox Valley's acquisition of the rail properties of two small railroads. One, Fox River Valley Railroad Corporation (FRVR), has 200 miles of track between Green Bay and other points in Wisconsin. The other, Green Bay and Western Railroad Company (GBW), has 250 miles of track in the same region. The acquiring firm, which we are calling Fox Valley, is a subsidiary of Western Central Transportation Corporation, a rail holding company that through its other subsidiaries has 2,000 miles of track in Wisconsin and adjacent states. WCTC created Fox Valley solely to be the buyer of the rail assets of FRVR and GBW. The plan was to integrate these carrier operations with those of WCTC's other subsidiaries, enabling duplicate facilities to be eliminated and the number of workers reduced; for although the lines of FRVR and GBW are not parallel to each other, they are parallel to lines of other subsidiaries of WCTC. Since Fox Valley acquired specific assets of FRVR and GBW rather than the corporations themselves, the two corporations survive, albeit largely as shells.
 
 
 2
 Fox Valley claims that its acquisition of the rail assets of FRVR and GRB comes under 49 U.S.C. Sec. 10901(a)(3). Although that section provides that a "rail carrier" may not "acquire or operate an extended or additional railroad line" without the Interstate Commerce Commission's approval, and was originally designed to control overbuilding, Paul Stephen Dempsey & William E. Thoms, Law and Economic Regulation in Transportation 50 (1986), the Commission has interpreted the section to apply as well to the initial acquisition of operating rights by which a firm entering the railroad business becomes a rail carrier. In re Chicago, Milwaukee, St. Paul & Pac. R.R., 658 F.2d 1149, 1169-70 (7th Cir.1981); Railway Labor Executives' Ass'n v. ICC, 914 F.2d 276, 277 (D.C.Cir.1990); Black v. ICC, 762 F.2d 106, 115 (D.C.Cir.1985); Alabama Southern Railroad Co., 1 I.C.C.2d 298, 299 (1984). This gloss (embodied in a regulation, 49 C.F.R. Sec. 1150.1) is relevant because it was only by acquiring the rail assets of FRVR and GBW that Fox Valley became a rail carrier.
 
 
 3
 The Commission held in the first order under review that, contrary to Fox Valley's submission, the acquisition was governed not by section 10901(a)(3) but by section 11343(a)(4). The latter requires the Commission's approval for the "acquisition of control of at least 2 carriers by a person that is not a carrier." This wording undermines the Commission's aggressive interpretation of section 10901(a)(3) as encompassing noncarrier acquisitions. Congress spoke specifically to such acquisitions and said that they required the ICC's approval only if two or more firms were acquired. A simple change of ownership, involving no actual or potential consolidation of carriers, raises few if any of the concerns that lie behind common carrier regulation, so it was not explicitly covered. But as no party questions the applicability of section 10901(a)(3) to noncarrier acquisitions--indeed, since challenging this application would serve the interest of neither party in this litigation--we proceed.
 
 
 4
 In a section 11343 transaction, the Commission is required, as a condition of its approval, to make the carrier protect the workers affected by the transaction. 49 U.S.C. Secs. 11344, 11347; Norfolk & Western Ry. v. American Train Dispatchers' Ass'n, 499 U.S. 117, 132-33, 111 S.Ct. 1156, 1165, 113 L.Ed.2d 95 (1991). The required protections are those the Commission prescribed in New York Dock Railway, 360 I.C.C. 60 (1979), and include paying workers made surplus by the transaction and unable to find another railroad job up to six years' wages. In contrast, in a section 10901 transaction, the Commission "may" require labor protection, but need not. It is a matter of discretion, 49 U.S.C. Sec. 10901(e)--and the Commission has ruled that only in exceptional circumstances will it exercise its discretion in favor of requiring labor protection in 10901 cases. Redden v. ICC, 956 F.2d 302, 304-05 (D.C.Cir.1992); Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901, 1 I.C.C.2d 810, 813-15 (1985). This blanket forbearance is intimately related to the Commission's expansive reading of section 10901. Both are aspects of the Commission's new-found desire to free the railroad industry from unnecessary regulation. By interpreting section 10901 broadly and exempting transactions under it from the duty of labor protection, the Commission has fostered the creation of new, unregulated short-line railroads to take over lines formerly operated by regulated railroads. Paul Stephen Dempsey & William G. Mahoney, "The U.S. Short Line Railroad Phenomenon," 24 U.Toledo L.Rev. 425 (1993). The Commission couldn't do this under section 11343 because labor protection for transactions governed by that section is made mandatory by section 11347. Paradoxically, by expanding the scope of a regulatory statute (section 10901) the Commission has reduced the scope of regulation.
 
 
 5
 Bold the Commission's interpretation was, but not reckless. The different statutory treatment of labor protection under the two statutes, 10901 and 11343, reflects the fact that a multicarrier acquisition is more likely to eliminate jobs--often that is the very purpose of the acquisition--than a transaction in which the assets of a single firm are shifted from one owner to another; and from this standpoint it makes no difference whether the acquirer is a carrier already. As a practical matter, however, the transaction in this case is much closer to the former than to the latter pole. Fox Valley's argument that it did not acquire control of two or more carriers because FRVR and GBW survive as completely independent corporations is hypertechnical and was rejected by the Supreme Court in a related context in United States v. Marshall Transport Co., 322 U.S. 31, 39, 64 S.Ct. 899, 903, 88 L.Ed. 1110 (1944); cf. Standard Office Building Corp. v. United States, 819 F.2d 1371, 1378 (7th Cir.1987). Fox Valley acquired the carrier component of these corporations and did so for the purpose of integrating multicarrier rail operations. The sellers live on as corporations, but not as carriers, for they have no rail assets, and so could not provide rail service if they wanted to. If FRVR and GBW had placed their rail assets in subsidiary corporations that Fox Valley then acquired, there would be no doubt that the acquisition was governed by section 11343(a)(4). We do not think the Commission is precluded from interpreting the transaction that did occur as functionally, practically, and therefore (by a small further step) legally the same. It ill becomes Fox Valley to complain that the Commission is departing from the strict statutory language of 11343 when Fox Valley's whole case rests on the Commission's loose interpretation of 10901.
 
 
 6
 Which is not to deny that the Commission's interpretation of 11343 required some fancy footwork--specifically, required the Commission to indulge the fiction that Fox Valley was not a carrier when the transaction took place. It is a fiction because Fox Valley is the cat's paw of Western Central Transportation Corporation, a parent of carriers, and the purpose of the transaction was, as we have said, to consolidate the latter's rail properties with those of FRVR and GBW, a consolidation that if done directly would have fallen under one, two, three, or possibly four other subsections of 11343. 49 U.S.C. Secs. 11343(a)(1), (a)(2), (a)(3), and (a)(5). But it is a beneficent fiction. When rail lines are consolidated, whatever the corporate form by which the consolidation is brought about, workers are made redundant, producing the clamor for protection that received statutory recognition in section 11347.
 
 
 7
 The same result could easily have been reached by a different path if, consistent with the Commission's "alter ego" doctrine approved in Railway Labor Executives' Ass'n v. ICC, 999 F.2d 574, 577-79 (D.C.Cir.1993), the Commission had disregarded Fox Valley and considered the reality of the transaction to be the acquisition of FRVR and GBW by WCTC for consolidation with WCTC's other rail operations, a transaction that would fall squarely within the scope of section 11343(a)(4). The path is not important. What is important is that unless the Commission is permitted enough interpretive latitude to close obvious loopholes opened by the manipulation of corporate forms, the statute will be quickly nullified by clever lawyers. Cf. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Yosha v. Commissioner, 861 F.2d 494, 497-98 (7th Cir.1988).
 
 
 8
 Since section 10901 authorizes though does not compel the Commission to impose the New York Dock conditions on a transaction governed by that section, and since by its liberal interpretation of section 11343 to embrace the transaction in issue the Commission has signified its belief that those conditions should be imposed on this transaction--for labor protection is the only pertinent difference between the two provisions--the vigor of Fox Valley's attack on the Commission's classification may seem inexplicable. If through some unpluggable loophole the transaction does not fall under section 11343, requiring imposition of New York Dock conditions, it falls under 10901, authorizing their imposition, and since the Commission believes these workers should be protected (why else did it strain to fit the transaction into section 11343?) one might expect it to exercise its discretion in favor of imposition were we to hold that the transaction was governed by 10901 after all. The problem is that the Commission has (as we saw earlier, and as the Commission repeated in this very case) tied its hands by declaring that it will not impose labor protection in section 10901 cases unless there are exceptional circumstances. 9 I.C.C.2d at 214-15; Railway Labor Executives' Ass'n v. ICC, supra, 999 F.2d at 579-80. In effect the Commission is stretching 11343 in order to introduce needed flexibility into the administration of 10901. This is a baroque way of proceeding, but we cannot say that it is arbitrary.
 
 
 9
 Fox Valley has, however, another string to its bow. After the Commission's first order, which held that the acquisition was governed by section 11343 rather than by section 10901, Fox Valley, in order to obtain the Commission's approval for the transaction (should the Commission's first order be sustained), began negotiating with the unions representing GBW's rail workers a plan that would guarantee them the protection of the New York Dock conditions. In addition to protecting for up to six years the wages of workers who are laid off, New York Dock imposes conditions concerning the retained workers' job assignments and seniority. As the details vary from carrier to carrier, the authorizing statute (section 11347) directs the Commission to require that the carrier make a "fair arrangement" to ensure implementation of the required conditions. The statute permits, and New York Dock assumes, that the arrangement will be negotiated between the carrier and the unions representing its employees. But not all railroad workers are unionized. GBW's were, but FRVR's were not. Fox Valley argues that with respect to nonunionized workers the fair arrangement required by the statute can be imposed unilaterally by the carrier, as there is no representative to negotiate with--and that is what it did. The Commission held, in the second order under review, that the carrier cannot act unilaterally even in such a case; it must negotiate either with the individual employees or with ad hoc representatives. Fox Valley rejoins that the Railway Labor Act provides the exclusive method of collective bargaining in the railroad industry and that anyway affected workers are protected even if the arrangement is imposed unilaterally because the arrangement must (and the arrangement it imposed on FRVR's workers did, it argues) satisfy the requirements of New York Dock.
 
 
 10
 This is an interesting question but moot. After the Commission threw out the unilateral arrangement, FRVR's workers voted for union representation and all of them now have unions as their certified bargaining representatives, just like GBW's workers. Fox Valley has begun, and may even have completed, negotiating with these unions the "fair arrangements" that the statute contemplates. To stave off a finding of mootness it argues that if the Commission was wrong to throw out the unilateral arrangement concerning the workers formerly employed by FRVR, the subsequent arrangements negotiated with the unions representing those workers are void and the original arrangement will spring back into effect. But Fox Valley has failed to present any evidence that the arrangements it negotiated with the various unions were more disadvantageous to it than the unilateral arrangement which it claims fully satisfied the requirements of New York Dock. Remember that these arrangements are designed to implement, not to vary, the protections of New York Dock. So it cannot be assumed that the carrier is hurt by having to negotiate the arrangements. So far as appears, the only reason Fox Valley adopted an arrangement unilaterally was that there was at the time no union to negotiate with. Now there is and Fox Valley has negotiated with it and as far as we know the terms do not differ from those of the unilateral arrangement.
 
 
 11
 It might seem that since Fox Valley has negotiated agreements incorporating New York Dock conditions, the entire case is moot, since the only difference between classification of a transaction under section 10901 and under section 11343 that is material to this case has to do with whether those conditions must be imposed. But the conditions are mandatory terms of all arrangements that Fox Valley might make with its employees or their representatives. Fox Valley had no choice if it wanted the acquisition to go through. If the order classifying the acquisition under section 11343 were vacated, and, as is most likely, the Commission refused to reimpose the conditions under 10901, Fox Valley would not be obliged to bow to union or worker demands for New York Dock protections.
 
 
 12
 We affirm the Commission's first order, and dismiss the petition to review the second as moot.
 
 
 
 *
 Hon. James B. Zagel of the Northern District of Illinois