In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3848

WARREN JOHNSON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ADVOCATE HEALTH AND HOSPITALS CORPORATION, doing business as ADVOCATE CHRIST MEDICAL CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-08141 — **Manish S. Shah**, *Judge.*

ARGUED SEPTEMBER 15, 2017 — DECIDED JUNE 8, 2018

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Employees of Advocate Health and Hospitals Corporation (Advocate) claim that they were treated unfairly based on their race. The district court granted Advocate's motion for summary judgment, finding that the plaintiffs failed to offer evidence necessary to support an element of their claim. We agree with the district court on all

issues but the question of the hostile work environment, and remand to the district court for a determination of that claim.

## I.

Plaintiffs Warren Johnson, Robert Pannell, Kimberly Scott-Murray, Annette Smith, and Sherry Young all claim that they faced race discrimination at the hands of supervisors when they worked as Environmental Service Technicians (EVS techs) at Advocate. EVS techs perform work that would traditionally be called janitorial work. They clean and disinfect hospital rooms and common areas, make beds, and the like. The EVS techs claim that they were treated unfairly because of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. and 42 U.S.C. § 1981.[1]

In 2012, Advocate contracted with Aramark Healthcare Support Services and reorganized the supervision and operation of the EVS department. Under the Service Agreement between Advocate and Aramark, Aramark was responsible for managing the EVS department while abiding by the policies of Advocate, including, among other policies, Advocate's non-discrimination policy. See, e.g., R. 62-6 at 6, 16, Page ID 1941, 1951. Shortly thereafter, the plaintiffs claim that Aramark-employed supervisors Susan Castillo, Christopher Skalnik, and Mariusz Michalkowski engaged in discriminatory acts against the plaintiffs. The claims of discrimination include: (1) Johnson and Smith were paid less than

---

[1] We generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)

white EVS techs; (2) Pannell and Scott-Murray were denied promotions and raises; (3) Plaintiffs were managed and disciplined more scrupulously than their non-African-American co-workers, and terminated in a discriminatory fashion; (4) African-American plaintiffs were given less desirable and more strenuous assignments; (5) Aramark supervisors subjected the plaintiffs to offensive and derogatory racial comments, creating a hostile work environment.

The district court granted Advocate's motion for summary judgment on all counts, concluding that the plaintiffs did not experience severe or pervasive race-based harassment, that there was no basis for employer liability, and that the plaintiffs failed to demonstrate that racial animus motivated the decisions to terminate Johnson, Scott-Murray and Smith. *Johnson v. Advocate Health & Hosps. Corp.*, No. 14 CV 8141, 2016 WL 5871489 (N.D. Ill. Oct. 7, 2016). As for the hostile work environment claim, the lower court held that the comments, although concerning, were too isolated, indirect, and sporadic, and not so serious as to have affected the plaintiffs' working conditions. *Id.* at *8. The district court also concluded that there was no basis for employer liability. *Id.*

## II.

The plaintiffs' brief is awash in facts and controversies. They claim that these numerous disputes and presentations of conflicting evidence create genuine issues of material fact. It is true that cases with jumbles of ostensibly disputed facts often signal the need for a trial on the facts. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Not all disputed facts, however, are relevant and material. On summary judgment we must view the facts and make all reasonable

inferences that favor them in the light most favorable to the party opposing summary judgment. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017). The following common refrains in summary judgment cases are important to recall in a case with so many factual recitations:

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.

*Payne*, 337 F.3d at 770 (internal citations and quotations omitted). To defeat a motion for summary judgment, the party opposing it must make a "showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is a critical moment for a non-moving party. It must "respond to the moving party's properly-supported

motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Inferences supported only by speculation or conjecture will not suffice. *Skiba v. Ill. Cent. R.R. Co.*, No. 17-2002, 2018 WL 1190856, at *7 (7th Cir. Mar. 8, 2018). Neither will the mere scintilla of evidence. *Grant*, 870 F.3d at 571.

Although these common refrains are familiar, the task is often easier to describe than to perform, and plenty of credibility-weighing traps lay before a court, particularly in such fact-intensive cases. See, e.g. *Payne,* 337 F.3d at 771. As our review is de novo, we affirm the district court only when no reasonable jury could have found for the plaintiffs. See, e.g., *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018).

On top of the normal lattice of summary judgment demands, we must also apply the constructs of employment discrimination law. For years we have tangled with a "rat's nest of surplus tests" in employment discrimination cases— struggling to pigeon hole evidence into the direct or indirect method with various overlaying requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016). Our Circuit has now clarified the singular question that matters in a discrimination case: "[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of

evidence proves the case by itself … . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

Plaintiffs allege that the district court's analysis failed to comport with this new standard in *Ortiz*, but we disagree. The district court did exactly as *Ortiz* demands and ignored the old "convincing mosaic" language and cut straight to the "bottom line and determine[d] whether there [was] evidence from which a reasonable trier of fact could infer discrimination from Advocate's actions as to each particular plaintiff." *Johnson*, 2016 WL 5871489, at *5 (N.D. Ill. Oct. 7, 2016), (citing *Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016)).

Despite doing away with the need for separate tests and "mosaics," the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (noting that "*Ortiz*, however, did not alter [t]he burden-shifting framework created by *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)"). There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor. But because the framework is helpful we use it to evaluate each of the plaintiffs' claims by looking to see whether the plaintiffs (1) are members of a protected class; (2) performed reasonably on the job in accord with their employer['s] legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated

more favorably by the employer. *David*, 846 F.3d at 225. All of the plaintiffs are African-American and thus fall within a protected class. Using this framework as an organizational guide, we address each of the plaintiffs' claims individually, beginning with the plaintiffs' claims that they received lower pay than non-African-American EVS workers.

## A. Pay disparity

Plaintiffs Johnson and Smith claim that they were paid less than white associates because of their race. Plaintiff Pannell also asserts that he did not receive "charge pay"— extra pay for performing work outside of his job description. To make these claims successfully, the plaintiffs needed to produce evidence that similarly situated non-African-American employees were treated more favorably. *Reed v. Freedom Mortg.*, 869 F.3d 543, 549 (7th Cir. 2017). Similarly situated means "directly comparable" in all material respects. *Id.* "The proposed comparator need not be identical in every conceivable way, however, and courts must conduct a common-sense examination." *Id.* (quoting *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013)). "The similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). In the *Coleman* opinion, the court warned against using a mechanical "magic formula" for the similarly-situated inquiry but yet set forth some examples of evidence that would be required in the usual case. These included whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) "engaged in similar conduct without such differentiating or mit-

igating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citing *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Once again, this is not a hard and fast test, and there is no magic to these considerations. In the employment discrimination context, the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence. Relevant evidence means evidence having "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence of what has happened to other employees is only relevant if that employee is in the same boat as the plaintiff. For example, one would expect an employee with ten years' experience to be paid more than an employee with ten months' experience. Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue. *Coleman*, 667 F.3d at 846–47; *Reed*, 869 F.3d at 549.

The plaintiffs argue that Johnson identified two white EVS technicians named "Kelly" and "Diane" (last names unknown) who disclosed their salary information to plaintiff Johnson and, according to Johnson, told him that they were paid at a higher rate than he was. The plaintiffs argue that Advocate did not "adequately justify or reconcile this pay discrepancy" and that even if it did, Advocate mistakenly thought that Johnson was referring to Diana Esparaza when actually Johnson was referring to a different person named "Diane." (Appellants' Brief at 10). The defendants, however, did not have an obligation "to justify or reconcile this pay

discrepancy." It is the plaintiffs' responsibility, on summary judgment, to make a "showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. It is the plaintiffs' responsibility to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. There is no requirement that the moving party support its motion with any evidence negating the opponent's claim. *Id.* at 323.

Other than Johnson's statement that "Kelly" and "Diane" told him they had higher salaries, and that Diane told Johnson that she had no prior experience in a hospital, the plaintiffs make no showing to establish an essential element on which they would bear the burden at trial—that is, whether Kelly and Diane were similarly situated to the plaintiffs. They submitted no pay records, nothing about their qualifications or experience (other than that Diane was an aqua teacher at a park and had not worked at a hospital before), who supervised Kelly and Diane, how long they had worked for the hospital, what types of reviews they received, and if they had been subject to any discipline. In fact, the plaintiffs never revealed the last names of "Kelly" and "Diane" such that the defendant could, on its own, look for the answers to any of these questions. Even if Kelly and Diane did, in fact, receive more money than Johnson, without knowing whether they were similarly situated, a court has no way of discerning whether this information is relevant to a claim of race discrimination.

Advocate also argues that Johnson's report of what "Kelly" and "Diane" told him is hearsay. Johnson retorts that this is a statement by the defendant's employee on a

matter within the scope of that employee's relationship with Advocate and thus not hearsay pursuant to the exclusions enumerated in Federal Rule of Evidence 801(d)(2)(D). It is unlikely, however, that this statement falls within the exclusion of Rule 801(d)(2)(D). In order to be excluded, the declarant must be involved in the "decisionmaking process affecting the employment action." *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007). These declarants were not.

But we need not belabor this hearsay point too much. As we have just reasoned, even if the statement does not constitute hearsay, it does not provide any relevant information that would help defeat summary judgment. For purposes of Title VII, plaintiffs need to produce evidence that similarly situated non-African-American employees were treated more favorably. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010). And the plaintiffs have not done so.

Smith makes the same claim—that two white associates, who did not have previous housekeeping experience, informed her that their hourly rates were higher than hers. R. 46-3 at 63, Page ID 676. Smith's claims fail for the same reasons that Johnson's do—lack of evidence that the other employees were similarly situated.

Likewise, Pannell claims that he was often directed to perform work outside of his job description thus warranting extra "charge pay," but yet never received such pay. He claims that there was no evidence that white employees in his job category were asked to perform these tasks, nor was there evidence that they were deprived of the charge pay. Once again, however, the burden was on Parnell to produce evidence of a disparity and he failed to do so in any manner. He did not submit affidavits from white EVS technicians

who were paid for their work, records of assignments, pay, or any other scintilla of evidence of how similarly situated white employees were treated. In sum, the plaintiffs failed at their burden of putting forth relevant evidence on these facts, and thus cannot survive a motion for summary judgment on the claim that African-American plaintiffs were paid less than non-African-Americans, either in salary or charge pay.

**B. Failure to promote**

The plaintiffs also contend that there are disputed questions of material fact regarding whether the African-American EVS tech plaintiffs were passed over for promotions in favor of white EVS workers with less experience and seniority. Here again, plaintiffs have failed to make a showing sufficient to establish the existence of the same element discussed above which is essential to their case and on which they will bear the burden of proof at trial—that is, that there are similarly situated non-African-American workers who were treated more favorably. See *Celotex*, 477 U.S. at 322.

The plaintiffs allege that Johnson, Pannell, Smith and Scott-Murray applied for promotions that were instead given to white EVS techs with less experience. We can quickly dispense with Scott-Murray's claim as he does not dispute that he did not apply for any promotions. R. 64 at ¶54, Page ID 2040. Advocate offered Pannell a Tech 2 position but he declined it because it was not on his preferred shift. R. 64 at ¶36, Page ID 2029–30; R. 62-10 at ¶13, Page ID 1986. Thus, according to the undisputed facts, neither Pannell nor Scott-Murray were denied a Tech 2 position. No reasonable juror could infer that Pannell and Scott-Murray were passed up

for promotions because of their race. They were not passed up at all.

Johnson and Smith, on the other hand, did apply unsuccessfully for other positions. They both claim that Advocate's hiring personnel passed over their applications and hired non-African-American people with less seniority or experience in their stead. Smith's evidence consisted of her deposition testimony that she applied for positions, did not get the jobs, and that white applicants did. Save for one exception, she did not know the names of any of the applicants, nor anything about their experience, qualifications, resumes, or interviews. R. 46-3 at 9, 11–12, 65–67, Page ID 622, 624–25, 678–80. Smith did know that a white woman named Mary Harris, received a dispatcher position for which she applied. R. 46-3 at 9, Page ID 622. Other than knowing that Harris had worked in an office before, however, Smith did not know anything else about Harris' resume, background, qualifications or why she was selected for the position. *Id.* Just as before, it was the plaintiffs' burden to set forth factual information to demonstrate that these other applicants were similarly situated, and they failed to do so.

Johnson's claim contains the same defect. Although he does identify four white employees who received positions for which he unsuccessfully applied—Gina Lika, John Mueller, Lance White, and Fred (Last Name Unknown)—he offers no evidence of their background, qualifications, resume, or any other information that would satisfy the plaintiff's burden to demonstrate that the comparators were similarly-situated applicants. Although the brief points to Plaintiff's Response to Defendant's Statement of Material Facts as to Which There is No Genuine Issue (Appellant's Brief at 12–

13), and that document, in turn, points to depositions and declaration pages, we could not find, despite our digging, any relevant material evidence that the employees who received the promotions for which Johnson and Smith applied were similarly situated to the latter. It was, of course, the plaintiffs' responsibility to point us to any evidence that would have supported this essential element of their claim. It has become axiomatic in this Circuit to remind parties in colorful terms that "[j]udges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

The most we could find through our charitable truffle hunting was a sprinkling of speculative statements that the white employees who received the positions seemed like they may have been less qualified than African-American candidates. For example, Pannell stated in his deposition that a white candidate who was hired must have had less experience than Scott-Murray because "[h]e [the white candidate] was hired, and he had to be trained, so I mean if [Scott-Murray's] already been trained, he has got less experience." R. 46-1 at 9, Page ID 460. And in regard to a different position, Pannell stated that he spoke with the hired candidate and, "[h]er background, as far as being a tech two, I talked with her and she said she had never done that type of [tech two] work before." R. 46-1 at 10, Page ID 461.

Finally, Johnson stated in his deposition that two white women, whose names he did not know, received jobs in positions for which he had applied. According to Johnson, one had the state approved certification for the job (which Johnson did not have), but Johnson did not know anything about

her other qualifications. The other was, at that time, going through the state certification program and had no other work experience other than "she said she worked on and off at Popeyes." R. 46 at 62–63, Page ID 422–23. The brief makes no claim that any of these employees who were hired were similarly situated to Johnson or Smith and the citations in the brief do not point to any relevant support that they were. The plaintiff has failed to make a showing sufficient to establish the existence of the element that is essential to their claim—that similarly situated non-African-American employees were treated more favorably by the employer vis-à-vis promotions. *Celotex*, 477 U.S. at 322; *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

## C. Disparate terminations

The lack of a relevant comparator similarly dooms several other of the plaintiffs' claims. Smith, Johnson, and Scott-Murray each claim that they were terminated because of their race. But once again, none of the plaintiffs sets forth any admissible evidence that similarly situated white employees were treated more favorably. For example, Smith alleges she was terminated for refusing to work in her assigned area, while another white employee, Jolanta, who also refused to work in her assigned area, was not terminated, reprimanded, or sent home. The brief is silent as to any evidence that Jolanta was similarly situated. The plaintiffs offer no evidence about who Jolanta was, what her position was, who supervised her, why she refused to work in her assigned area, and whether she had a similar disciplinary record and similar performance reviews. Arguments that consist of conclusory allegations that are not properly developed are waived. *Anderson v. Catholic Bishop of Chicago*, 759

F.3d 645, 649 (7th Cir. 2014). But even if we dig through the statement of facts (which, again, we should not need to do), the only evidence that the plaintiff and Jolanta were similarly situated is that they shared the same supervisor R. 64 at ¶ 78, Page ID 2052–53. We have no idea whether Jolanta was otherwise similarly situated, or whether there were any unusual circumstances, mitigating factors, difference in seniority, that would have made the comparison inapt.

The same deficiencies plague Scott-Murray's claims of a racially-based termination. Her non-specific claim that she was disciplined for false reasons is unsupported by any details or any comparison to similarly situated non-African-American employees. She does raise one example of a non-African-American employee being treated differently for the same conduct. Advocate ultimately terminated Scott-Murray for taking an unauthorized break. Scott-Murray alleges that she was actually performing her job by cleaning the conference room at the time of the alleged infraction. She also asserts that Diana Esparaza, who is not African American, was shown more favor by the supervisors and was not terminated even when she sat in the lobby using her phone and watching television. The brief provides no information as to whether Scott-Murray and Esparaza had the same supervisor, or whether they were subject to the same standards.

Johnson also disputes the motivations behind his termination claiming that management unfairly criticized him, held him to unfair standards, nitpicked and micromanaged. This evidence cannot support a claim for race discrimination unless he can set forth some evidence that similarly situated non-African-American employees were not treated in the same manner. A supervisor who nitpicks, micromanages,

and holds employees to unreasonable standards is simply a bad boss. It is only if she applies this poor management unequally based on race that a plaintiff has a claim for race discrimination.

As evidence of this claim, Johnson makes only the same type of similarly broad and conclusory allegation that "white EVS were not subject to such excessive scrutiny, micromanagement and monitoring." (Appellant's Brief at 15). But even if such an undeveloped, generalized argument that supervisors treated white employees better than black employees is not waived (and we believe it is, see *Anderson*, 759 F.3d at 649), it certainly is not sufficiently supported by evidence so as to survive a motion for summary judgment. Johnson's only evidence on this matter was his testimony that "they walk up behind me, the fact that they nitpick. They won't follow white people or Polish people. They will just follow black people. It's a fixation upon black people." R. 46 at 51, Page ID 411. Johnson can certainly set forth evidence of discrimination in his own declaration or deposition, but speculation as to an employer's state of mind is not sufficient to create an issue of material fact. *Payne*, 337 F. 3d at 772. Nor is a vague claim based on the employee's subjective belief that supervisors "nit-picked black" but not white employees. *See Id.*

Johnson tries to create a material dispute of fact by pointing to inconsistencies in the defendant's claims about how many beds each employee was expected to clean on each shift and whether he was adequately meeting the cleaning standards and expectations of the employer. There may be disputed facts about how many beds employees were expected to clean, but unless there was some evidence that Af-

rican-American employees were held to a different standard than white employees, the dispute is not material to the question of race discrimination.

## D.  Discriminatory assignments

The related claims—that supervisors assigned African-American EVS technicians to more strenuous and less desirable assignments—also lack evidentiary support. The plaintiffs testified that some assignments required more effort than others. Even accepting the bare allegations that some floors were less desirable and that more African-American employees were assigned to these floors (both allegations without factual support), the plaintiffs have not set forth sufficient evidence to demonstrate that the non-African-American employees who cleaned the allegedly easier floors were similarly situated. We do not know, for example, whether those non-African-American employees had more seniority or different qualifications or were assigned to those floors by request or for other reasons. Moreover, the evidence that higher floors were more strenuous came either from the plaintiffs subjective opinion or speculation as to co-workers states of mind. *See, e.g.* R. 46-1 at 8, Page ID 459 ("Q: Is it possible that some people would find that [a lower floor] to be more difficult? A: I've worked there. I wouldn't say so, no.") In short, this claim fails for the same reason as the others—the plaintiffs have failed make a showing sufficient to establish the existence of an element essential to their case. *Celotex*, 477 U.S. at 322.

## E.  Hostile work environment/racially derogatory speech

Although we find that the plaintiffs have failed to make a showing sufficient to defeat summary judgment on their

claims of race discrimination in pay discrepancy, failure to promote, termination, and discriminatory work assignments claims, the claims regarding racially derogatory speech and a hostile work environment fall on the other side of the line and survive a motion for summary judgment.

To state a claim for discrimination based on a hostile work environment, the plaintiffs must show that (1) they were subject to unwelcome harassment; (2) the harassment was based on their race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). The conduct alleged must be "sufficiently severe or pervasive to alter the conditions of employment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Whether conduct meets this bar depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.*; see also *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017). Sometimes our cases phrase the test differently, looking instead for evidence that the workplace was both subjectively and objectively offensive—either in lieu of the first prong—that the employee was subject to unwelcome harassment—or the third prong—whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment. See *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 n.6 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1614 (2017). In the end, we have concluded that the inquiry is the same. *Id.*

We expect a certain level of maturity and thick skin from employees. "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). "Discrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees. Instead, the law forbids an employer from creating an actionably hostile work environment for members of protected classes." *Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001). As the dissent rightfully points out, the environment need not reach the point of "hellishness," as some cases once argued. The Supreme Court standard dictates that the discrimination must be only so severe or pervasive so as to affect the terms and conditions of employment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993). This is a far cry from hellish.

The district court determined, as a matter of law, that the conduct complained of was not sufficiently severe or pervasive. We disagree. Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury. *Passananti*, 689 F.3d at 669. *See also, Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016); *Mosby–Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007). In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive. In this case, it is certainly possible that a reasonable jury could find that the conduct was pervasive or severe based on the claims of racially derogatory speech used by Aramark supervisors. Once again,

we remind ourselves that as we review the facts on sum-
mary judgment we do so in the light most favorable to the
plaintiffs and refrain from resolving swearing contests. We
have divided those facts—the incidents of racially derogato-
ry speech—into three categories: comments made directly to
plaintiffs; comments made directly to non-plaintiff co-
workers and comments made to non-plaintiffs about which
others were aware.

1. Racially charged language

    a. *Comments made directly to plaintiffs*

The defendants argue that the plaintiffs have little admis-
sible evidence to support assertions that supervisors used
racially derogatory language (Appellees' Brief at 22). This is
not so. The plaintiffs cited to deposition testimony and
sworn declarations in which the plaintiffs testified that they
heard racially derogatory language. Nothing more is re-
quired on summary judgment. "Provided that the evidence
meets the usual requirements for evidence presented on
summary judgment—including the requirements that it be
based on personal knowledge and that it set forth specific
facts showing that there is a genuine issue for trial—self-
serving" testimony is an acceptable method for a non-
moving party to present evidence of disputed material facts.
*Payne*, 337 F.3d at 773.

Supervisor Castillo told plaintiff Johnson that he
"cleaned like a monkey." R. 64 at ¶ 25, Page ID 2002; R. 46 at
68, 87, Page ID 428, 447. Supervisor Michalkowski would use
the N-word around African-American employees and would
"mock Johnson as if to say African Americans only speak
slang," and answer "yo" when Johnson would say "hello."

R. 64 at ¶ 26, Page ID 2023; R. 46 at 54, Page ID 414. He would try to rap, or say "I'm from the hood," or speak using stereotypical African-American slang when African-American EVS techs were around. R. 46-1 at 56–57, 83, Page ID 507–08, 534; Supervisor Skalnik told plaintiff Scott-Murray not to give him the "black girl ghetto attitude." R. 64 at ¶ 45, Page ID 2035; R. 46-2 at 16, Page ID 553. Pannell once heard Supervisor Hudson call plaintiff Young "a black B. Bipolar. Crazy." R. 64 at ¶ 42, Page ID 2033–34; R. 46-1 at 54, Page ID 505. Supervisor Hudson called Young "black wig-wearing witch[ ]." R. 46-4 at 5, Page ID 690. Hudson also called Young "bipolar" and "crazy." R. 64, ¶ 42, Page ID 2033–34. Plaintiff Young testified that she often heard Michalkowski mocking African Americans and on several occasions ("about three," she testified), she heard him use the N-word:

> Mike always had the black jokes, you know. The—he always the black, the slums, the slang talk. And make fun about how, you know, we talk, Black people talk. And I found it to be very offensive … you know, yo this and we be saying and, you know how black people—black slang talk. Oh man, we be doing this, but he talk, try to talk the exact same way the black guys be talking, yo ni**er this, yo ni**er that because that's the words they used to each other … He did it quite a bit. Had his black slang talk, you know, yo ni**er this, yo ni**er.

R. 46-4 at 70, Page ID 755 (edits ours).

      *b.  Direct comments made to non-plaintiffs*

Comments made to non-plaintiff co-workers carry less weight in the evaluation of a hostile environment claim, but they are not irrelevant. *Russell*, 243 F.3d at 343 (noting that "[w]hen harassing statements are directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.") After all, the plaintiffs' burden in a hostile work environment claim is to demonstrate that racially charged comments were severe or pervasive. Evidence that the same supervisors made racially derogatory comments to other employees in the same positions is certainly relevant evidence tending to make it more likely that the discrimination was pervasive. Eventually a jury will be able to weigh such evidence and, with instruction, give it the appropriate amount of weight.

EVS tech Fernando Carpintero gave testimony through a declaration that Susan Castillo told him directly, while inquiring if he knew anyone who would be interested in working at Advocate, "I don't want any blacks. They're lazy." R. 62-12 at 2, Page ID 1993. A dispatcher for the EVS department, Mary Harris, testified through a declaration that, "[o]n one occasion, I told Susan Castillo that I think I could handle being a supervisor in the EVS department and Susan responded, 'Honey, you're the wrong color.'" R. 62-11 at 2, Page ID 1989.

      *c.  Comments made to others about which the plaintiffs heard*

The weakest evidence the plaintiffs present is evidence about comments that they were told supervisors made—in

other words, hearsay. It appeared to be well-known throughout the hospital that Castillo had referred to an employee as a "porch monkey." For example, Connie Lockridge reported to her supervisor that it had happened. R. 62-2 at 14, Page ID 1740; R. 62-3 at 95, Page ID 1853. One dispatcher, Mary Harris, declared that she heard several African-American employees, including Lockridge, complain that Castillo used racially offensive terms such as "porch monkey." R. 62-11 at 2, page ID 1989. Another stated in his declaration that he was "personally aware that Castillo referred to African Americans as 'porch monkeys.'" R. 62-12 at 2, Page ID at 1993. Other employees reported hearing that Susan Castillo preferred to have Polish people cleaning rather than African-American people. See e.g. R. 46-3 at 39, Page ID 652. One of the supervisors who was himself accused of racism, Michalkowski, testified that an employee came to him to complain that supervisor Susan Castillo had called another employee a porch monkey. R. 62-2 at 13–14, Page ID 1739–40. Finally, an Advocate vice president said to another employee, within earshot of Johnson, that it was hard to get African-American employees to leave. R. 46 at 89, Page ID 449. Although these comments are largely hearsay, and in some cases, double hearsay, some of it could be admitted under hearsay exceptions. For example, it is evidence, not of the veracity of the remark of course, or even of the truth as to whether Castillo uttered it or not, but of the fact that employees understood their environment to be one in which derogatory statements were pervasive. This latter group of evidence might have some bearing in a trial on the merits, but it would be for the district court to determine whether these comments were more prejudicial than probative. We would caution against elevating workplace rumors to evi-

dence of a hostile work environment, although coupled with other evidence this testimony might have relevance in a hostile work environment claim.

   2.  This evidence is sufficient to create a triable issue of
       fact

The district court found that, although these comments were "cause for concern … they were not so serious (on their own or in combination) or so numerous that they materially influenced plaintiffs' working conditions." *Johnson*, 2016 WL 5871489 at *8. The district court asserted that there was no evidence that racially derogatory comments made to one plaintiff had any bearing on other plaintiffs' work environments, and thus combining the plaintiffs' experiences does not advance any one plaintiff's claim. *Id.* And in conclusion the district court stated that, "[t]he things each plaintiff heard were too isolated, indirect and sporadic to be actionable. Although plaintiffs should not encounter racism in their workplace, a hostile work environment claim under TitleVII and § 1981 does not provide relief from the comments made to plaintiffs." *Id.* at 19–20.

The district court, evaluating these claims on summary judgment—where relevant, material, admissible facts must be assumed to be true—erred by concluding that no reasonable jury could find these comments to be severe or pervasive. We have noted that "Given American history, we recognize that the word 'ni**er' can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (citing *Virginia v. Black*, 538 U.S. 343 (2003)) (edit

ours); see also *Passanati*, 689 F.3d at 668 ("in claims of racial harassment, racially-charged words certainly can suffice."); *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675–76 (7th Cir. 1993) (finding an actionable hostile work environment when supervisors and employees referred to plaintiff by the term "ni**er" between five and ten times during his employment).

The plaintiffs put forth evidence that one supervisor routinely harassed them by trying to mock what he thought was the speech of the African-American EVS techs, directly calling the African-American plaintiffs "ni**er." They also put forth evidence of supervisors calling plaintiffs "black wig-wearing witches," "a black B. Bipolar. Crazy," and telling a plaintiff she had a "black girl ghetto attitude." It may be, as the dissent points out, that some individual plaintiffs heard relatively few uses of racist language aimed directly at them as individuals. But, as we made clear through our catalogue of the evidence of racist statements made not only to plaintiffs, but to others (see supra pp. 22-23), the collective evidence is sufficient to infer that all of these co-workers knew that their supervisors were repeatedly using racist language towards many employees to define the working environment for all of them. And, it is also sufficient to infer that these supervisors were using racist language in a pervasive way to establish racial and hierarchical dominance in the workplace. That evidence should allow a reasonable jury to find that each of the plaintiffs experienced a racially hostile working environment.

The plaintiffs' evidence that the harassment altered the terms of their employment is thin perhaps, but it is enough to survive summary judgment. Particularly because we have

noted that "a plaintiff's repeated subjection to hearing that word [ni**er] could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Hrobowski*, 358 F.3d at 477. Several of the plaintiffs complained about the harassment through the official channels and testified about the stress they felt because of it, or the increase in the difficulty of their assignments. See, e.g. R. 64 at ¶¶ 14, 17, 23, 28, 30, 42, 46, 65, 69, Page ID 2015, 2017, 2021, 2024, 2026, 2034, 2036, 2045, 2047. As to the subjective component of the inquiry, all that the plaintiffs had to establish was that they perceived the environment to be hostile or abusive. *Hrobowski*, 358 F.3d at 477. A reasonable jury could find that these words, among them one of the most racially derogatory word in the English language, that the plaintiffs heard were unwelcome, and therefore there is an issue of material fact regarding subjective hostility. *Id.*

3. Employer liability

A showing of severe or pervasive harassment is necessary but not sufficient to survive summary judgment. The plaintiffs must also demonstrate a basis for employer liability. The question of employer liability has become a bit muddled in this case. The defendant in these proceedings is Advocate. The alleged discrimination came at the hands of Aramark's supervisors[2]. In Title VII cases, liability is direct

---

[2] For purposes of this appeal, the claims are basically limited to actions taken by Aramark supervisors. One Advocate employee, Margaret DeYoung, was alleged to have made one comment within earshot of plaintiff Johnson that "it's a hassle to get [blacks] to leave." R. 46 at 89, Page ID 449. Otherwise all the claims of the direct discrimination were directed at words and actions of Aramark employees, and then at Advocate for failure to stop or remedy the discrimination.

rather than derivative. *Dunn v. Washington Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005). The employer is actionable only for its own deeds. *Id*. Thus employers are strictly liable for the discriminatory acts perpetrated by supervisors and they are liable for the discriminatory acts of others—coworkers, independent contractors, customers, inmates etc.—only if they are negligent either in discovering or remedying the harassment. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017). The plaintiff bears the burden of showing that the employer knew of the problem and that the employer did not act reasonably to remedy the issue once it had knowledge. See *Dunn*, 429 F.3d at 691.

But which entity was the plaintiffs' employer for purposes of the Title VII claim, and must there be but one? It is not uncommon for employers to hire subcontractors or otherwise outsource supervision, just as Advocate did here. Under Title VII law, an employee is considered the supervisor of the alleged victim of discrimination when "the employer has empowered that employee to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). In other words, a supervisor is the one with the "power to directly affect the terms and conditions of employment. This power includes the authority to hire, fire, promote, demote, discipline or transfer a plaintiff." *Nischan*, 865 F.3d at 930. When analyzing which entity—Aramark, Advocate or both—served as the plaintiffs' de facto employer for purposes of Title VII liability, we use a five-factor test which requires us to consider:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2)

> the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991). See also, *Nischan,* 865 F.3d at 929. The most important of these factors is the ability to supervise and control the employees. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015). And of those control factors, the ability to hire and fire ranks as most significant. *Id.*

For purposes of Title VII an employee can have more than one employer. *Harris v. Allen Cty. Bd. of Comm'rs*, No. 17-2577, 2018 WL 2275752, at *3 (7th Cir. May 18, 2018). An entity can be an indirect employer or a joint employer or have some other complex combined relationship with an employee. *Whitaker v. Milwaukee Cty., Wisc.*, 772 F.3d 802, 810 (7th Cir. 2014). And when more than one entity is potentially involved in the employment relationship, a court should apply the *Knight* factors to determine which entity or entities qualify as an employer for purposes of applying Title VII. *Love,* 779 F.3d at 701–02. [3]

According to the plaintiffs, the Aramark supervisors approved overtime, created and changed schedules, approved

---

[3] The same *Knight* factors are used for differentiating between employees and independent contractors and also for determining who is an employer for purposes of Title VII liability. See *Love,* 779 F.3d at 702–05.

and denied vacation requests, assigned work, disciplined employees including issuing "Corrective Action Notices," did quality checks, and completed performance reviews. R. 63 at ¶ 30, 32, Page ID 2003. The parties agree that by contract, Advocate maintained ultimate control over disciplinary, hiring, and firing actions and that Aramark supervisors could not hire, fire or discipline any EVS tech without prior approval from Advocate. See R. 63 at ¶ 33, Page ID 2002–03; (Appellants' Brief at 20). In other words, the Aramark supervisors did have some supervisory and control powers in the sense that they supervised work, created schedules and assignments, recommended discipline, etc., but, by contract, a significant amount of control remained with Advocate. We therefore conclude that, because significant control remained in the hands of Advocate it was (at least one of) the plaintiffs' employers for purposes of Title VII liability.

The district court did not address the remaining *Knight* factors, nor delve further into the role that Aramark supervisors played in "tangible employment actions" directed at the plaintiffs. See *Vance*, 570 U.S. at 431. Such a discussion was not critical to its decision at the time, as it had found no evidence of discrimination. The court concluded, therefore, with a short-shrift explanation in a footnote, that the Aramark supervisors were not agents of Advocate. *Johnson*, 2016 WL 5871489 at *9 n.1. Now however, because we conclude that there is a factual question regarding the racially derogatory speech, we think it worth a full airing by the district court as to the relationship between Advocate, Aramark and the plaintiffs.

It is true that by the terms of the contract between the parties, Advocate retained final control of most of the tangible employment actions like hiring and firing. But it is also possible that, in reality, Advocate acted as a mere rubber stamp for the recommendations of Aramark supervisors about these tangible employment actions. Once the District Court ferrets out the question of supervisor status and the relationship between the entities, including whether "the employer may be held to have effectively delegated the power to take tangible employment actions" to the Aramark supervisors (*Vance*, 570 U.S. at 447), it can determine under which standard Advocate might be held liable for actions by Aramark supervisors—strict liability or negligence. And depending on which standard applies, the district court may need to consider whether Advocate took "prompt and appropriate corrective action reasonable likely to prevent the harassment from recurring." *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 898 (7th Cir. 2016), *cert. denied,* 137 S. Ct. 1614 (2017).

The district court will also have an opportunity to consider the remaining four *Knight* factors. These were not addressed by the parties or the district court because no discrimination had been found. But based on the record before this court now, it appears that many, but not all, of those factors confirm that Advocate was an employer.

For example, considering the second factor, it appears that, according to the contract between the parties, Aramark was responsible for some training of EVS techs. See R. 62-6 at 7, Page ID 1942 (Aramark leaders "will coordinate training and management of the hourly service employees on Advocate's payroll in those departments managed by Ara-

mark … .”). There has been no factual development on this point and the district court did not consider it.

The remaining factors all point to Advocate as the employer. Advocate was responsible for the costs of operation of the hospital including the equipment, fees, licensing, facilities and maintenance. Advocate paid the plaintiffs' salaries and the EVS tech employees expected to stay in their positions indefinitely.

The answer to the question of whether Advocate took "prompt and appropriate corrective action reasonable likely to prevent the harassment from recurring." *Cole*, 838 F.3d at 898 also will require a hard look at the particular facts and circumstances of the case at hand. But we conclude that there is sufficient evidence of notice to the employer to proceed past a motion for summary judgment. Johnson did not report the "porch monkey" comment to Advocate human resources, nor did he report Michalkowski's mocking slang, but other employees did. Johnson also reported to the president of the hospital that a supervisor had stated that she preferred to hire Polish workers rather than African-American workers because "they clean better." And Johnson submitted a list of African-American associates who he believed had been discriminated against and gave this list to Advocate's human resources department. Smith made several complaints to Advocate's human resources department about what she believed to be racially motivated behavior. R. 46-3 at 61, Page ID 674; R. 62-1 at 104–112, 144–145, Page ID 1649–57, 1689–90. Scott-Murray reported to Advocate human resources department that her Aramark supervisor told her "not to give him that black girl ghetto attitude." R. 64 at ¶ 45,

Page ID 2035. Based on these reports, a jury could conclude that Advocate had adequate notice of the problem.

As for adequate steps to remedy the discrimination, Advocate investigated many of the complaints, held some meetings, and met with some supervisors. It is true that an employer's course of action need not have been perfect, but it cannot be negligent. *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1030 (7th Cir. 2004). Advocate argues that it took sufficient corrective action by investigating "the allegations brought by Plaintiffs and [taking] remedial action in the form of training and rounding with associates." (Appellee's Brief at 41). Advocate also notes that it reassigned Castillo when certain allegations were made in fall 2014, and moved Skalnik away from Plaintiff Scott-Murray when she complained that he placed his hands on her. The district court pointed out that Advocate human resources employees investigated Scott-Murray's complaint against Skalnik; investigated Smith's complaints of improper treatment; provided discrimination and harassment training; instructed leadership to round with associates in EVS; and investigated Johnson's complaint about payroll errors and resolved some of them. *Johnson*, 2016 WL 5871489 at *3–4.

Plaintiffs argue that Advocate did not reprimand or terminate any of the harassers, including Castillo, Skalnik, or Michalkowski. Advocate did not separate Castillo from the employees who raised concerns about her. Although Advocate's human resources employee, Abigail Oman, stated that she investigated Johnson's claims that he and other African-American EVS techs were being treated unfairly, the plaintiffs argued that the investigation was wholly inadequate. Johnson had supplied Oman with a list of other African-

American EVS techs who he claimed were also being treated unfairly. Oman went back through her notes of conversations she had in the past with some of those African-American EVS techs to see if they had any past reports that corroborated Johnson's, but she did not re-interview any of the EVS techs after Johnson's complaint, and she did not interview workers on the list with whom she had never spoken. Nor did she contact any white EVS techs to compare their experiences. Certainly a jury could conclude that an investigation such as this one—a review of notes of previous conversations with some of the employees on Johnson's list—was negligent.

Finally, although Advocate held discrimination training sessions, it is undisputed that Michalkowski, one of the main alleged perpetrators of the discrimination, did not attend. There is, moreover, a clear factual dispute as to whether Castillo—the other Aramark supervisor most accused of discrimination—attended the human resources training sessions. The district court found it "unfortunate" that the alleged discriminators did not attend the anti-discrimination training. We think it is more than unfortunate; it creates a material fact as to whether Advocate took reasonable actions to remedy the alleged discrimination. A jury might well find that Advocate's actions were minimally sufficient or even completely so, but that is a factual determination based on all of the facts and circumstances of this particular case. And those "facts and circumstances" include the "gravity of the harassment alleged." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013); see also *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001) ("An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particu-

lar facts and circumstances of the case at the time the allegations are made."). In short, the question as to whether an employer's response was reasonably likely to end the harassment is fact specific and must be analyzed according to a totality of the circumstances review. By dismissing on summary judgment Advocate's liability for the hostile work environment, the district court declared that no reasonable jury could have found that Advocate's response to the discrimination was inadequate. We disagree.

Perhaps Advocate's response was adequate given the fairly low bar this court has set. *Williams*, 361 F.3d at 1030. But that is a factual determination to be made based on the individual facts and circumstances of this case. *Erickson v. Wisc. Dep't of Corr.*, 469 F.3d 600, 606 (the determination of employer liability is "fact-specific and must be analyzed according to the totality of the circumstances."); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990) (noting that the effectiveness of an employer's corrective action is a question of fact). In this case, we conclude that it could not be determined as a matter of law on a motion for summary judgment.

On a final note, we reject entirely the defendant's notion that it "strains credulity" to think that African-American employees might be subject to a hostile work environment where many of the managers in the workplace are also African-Americans. There are many reasons why women and minorities in management might tolerate discrimination against members of their own class, or why they might participate in discriminatory acts themselves. See, e.g., Ramit Mizrahi, *"Hostility to the Presence of Women": Why Women Undermine Each Other in the Workplace and the Consequences for*

*Title VII*, 113 Yale L.J. 1579 (2004). We need not delve into this extensive psycho-social research for purposes of this case.

### III.

In sum, we reverse the district court's grant of summary judgment on the hostile work environment claim in regards to the racially derogatory language, and remand to the district court for a determination on the merits of that claim. The decision of the district court is affirmed in all other respects.

MANION, *Circuit Judge*, concurring in part and dissenting in part. I agree with the court that the plaintiffs failed to adduce enough evidence to avoid summary judgment on their various disparate treatment claims, so I join its opinion in those respects. However, I disagree with the court's conclusion that the plaintiffs' hostile work environment claims should go to trial. For the reasons stated by the district court, I would affirm the judgment in favor of Advocate in its entirety.

It is of course true that even "[o]ne overtly racial comment is too many in terms of basic civility and expected workplace norms." *Johnson v. Advocate Health & Hosps. Corp.*, No. 14-CV-8141, 2016 WL 5871489, at *7 (N.D. Ill. Oct. 7, 2016) (opinion below). Nevertheless, "Title VII is not a general code of workplace civility, nor does it mandate admirable behavior from employers." *McKenzie v. Milwaukee Cty.*, 381 F.3d 619, 624 (7th Cir. 2004). "We will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yankick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Under this standard, we have held that "[a] handful of comments spread over months" is insufficient to demonstrate "severe or pervasive" harassment as a matter of law. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995); see also *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight comments over the course of employment not enough). In sum, although we have disclaimed our former use of the descriptor "hellish" to describe an actionable work environment, compare *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004) (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003)), with *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007), plaintiffs still must

clear a high bar to avoid summary judgment, see *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (comparing the "high standard for hostile work environment claims" with the even higher one for constructive discharge claims).

This is not a class action; each individual plaintiff must adduce enough evidence for a reasonable juror to conclude that he or she was subject to a hostile work environment. When viewed in this manner, the district court was clearly correct that "[t]he things each plaintiff heard were too isolated, indirect, and sporadic to be actionable." *Johnson*, 2016 WL 5871489, at *8. Indeed, once one discounts the plaintiffs' disparate treatment claims (as the court does), some of the plaintiffs' hostile work environment claims are extraordinarily weak. Plaintiff Kimberly Scott-Murray, for example, complains of just one racially charged comment the entire time she was employed at Advocate. She had no interaction with Susan Castillo and just one minor interaction with Mike Michalowski, so the conduct of these two major offenders had little to no impact on her work environment. Plaintiff Robert Pannell's claim is on even shakier ground; the only racially charged comments which he testified to hearing were not addressed to him. And neither the court today nor the district court pointed to any race-based comment made in the presence of Plaintiff Annette Smith. At the very least, we should affirm summary judgment for Advocate against these three plaintiffs.

Plaintiffs Warren Johnson and Sherry Young have somewhat stronger claims, but even their allegations fall short of demonstrating the type of work environment necessary to survive summary judgment. I agree with the district court

that "[e]ach of these comments should be cause for concern, but they were not so serious (on their own or in combination) or so numerous that they materially influenced plaintiffs' working conditions." *Id.* These "sporadic, offensive comments" are simply not enough to clear the high bar this court has set in order to bring hostile work environment claims before a jury. *Id.* Therefore, I would also affirm the district court with respect to Johnson's and Young's hostile work environment claims.[1]

Because I conclude that none of the plaintiffs proffered sufficient evidence to avoid summary judgment on their hostile work environment claims, I respectfully dissent from that portion of the court's opinion and judgment. I would affirm the judgment below in full.

---

[1] Because I conclude that the plaintiffs' hostile work environment claims should fail, I express no opinion on whether employer liability was appropriate in this case.